# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

————————————

No. 02-1561

————————————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Basim Omar Sabri, | * | |
| | * | |
| Appellee. | * | |

————————————

Submitted: June 14, 2002
Filed: April 7, 2003 (Corrected: 04/15/03)

————————————

Before HANSEN,[1] Chief Judge, BOWMAN and BYE, Circuit Judges.

————————————

HANSEN, Circuit Judge.

The government appeals from an order of the district court dismissing an indictment against Basim Omar Sabri. We reverse the judgment of the district court.

———————————

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

I.

The grand jury charged Sabri with three counts of bribery in violation of 18 U.S.C. § 666(a)(2).[2] The indictment alleged the following facts. The City of Minneapolis (hereinafter "City") received approximately $28.8 million in federal funds during the calendar year beginning January 1, 2001. The Minneapolis Community Development Agency (hereinafter "MCDA") is a City agency created to fund housing and economic development programs within the City. MCDA received

---

[2]The statute provides, in relevant part, that:

(a) Whoever, if the circumstance described in subsection (b) of this section exists–

. . . .

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666 (2000).

approximately $23 million in federal funds in the calendar year beginning January 1, 2001. The Minneapolis Neighborhood Revitalization Program (hereinafter "MNRP") is an agency created by the City and other local government entities which provides funding for the economic revitalization of City neighborhoods. MCDA wholly funds MNRP.

Sabri is a Minneapolis developer and landlord. During the spring and summer of 2001, Sabri was pursuing a commercial real estate project within the City's Eighth Ward. From 1993 through July 2001, Brian Herron served on the City Council, representing the Eighth Ward. He also served on the Board of Commissioners overseeing MCDA's budget. The government alleged that Sabri gave Herron $5000 in an attempt to obtain Herron's assistance in receiving regulatory approval from the City to commence the proposed real estate project; that Sabri offered Herron $10,000 to threaten the current property owners that the City would use its powers of eminent domain to take their property if they did not sell to Sabri; and that Sabri offered to give Herron $80,000 as a 10% kickback in return for his assisting Sabri to obtain $800,000 in community economic development grants for the proposed real estate project.

Sabri filed a motion to dismiss the indictment on the ground that § 666(a)(2) was facially unconstitutional because it does not require the government to prove a nexus between the offense conduct–the offering of a bribe–and the federal funds. Without such a "jurisdictional hook," that is, a clause that purports to ensure that the law applies only to activity that falls within the federal lawmaking power, Sabri argued that the statute was outside Congress's legislative power. The district court agreed with Sabri's arguments and granted his motion to dismiss the indictment.[3] We

---

[3]To the extent that the district court, relying on United States v. Lopez, 514 U.S. 549 (1995), concluded that § 666 contained no "'express jurisdictional element' that confer[red] federal court jurisdiction over the offenses described in § 666," United States v. Sabri, 183 F. Supp. 2d 1145, 1154 (D. Minn. 2002), it erred. The

agree with the district court that as a matter of statutory construction the government need not prove some nexus between the offense conduct and federal funds. We respectfully disagree that the statute as construed is beyond Congress's power to legislate.

## II.

We first turn to the question of statutory construction: whether § 666 itself requires that the government prove some connection between the offense conduct and the expenditure or use of federal funds. We hold that § 666 contains no requirement that the government prove some connection between the offense conduct and federal funds beyond the express statutory requirement found in § 666(b) which requires proof that the relevant organization, government, or agency received benefits under a federal program in excess of $10,000 in any one-year period.

The Supreme Court addressed this question of statutory construction in part in Salinas v. United States, 522 U.S. 52 (1997). Salinas, a deputy sheriff who had accepted bribes in exchange for arranging "contact visits" between a federal prisoner housed in the Hidalgo County jail and the prisoner's wife and girlfriend, argued that "the Government must prove the bribe in some way affected federal funds, for instance by diverting or misappropriating them" before the statute was violated. Id. at 55. A unanimous Court rejected Salinas's argument, noting that the "enactment's

Lopez Court's use of the word "jurisdiction" referred to the power of the Congress to enact legislation and not to the subject matter jurisdiction of the court. Lopez, 514 U.S. at 561. The district court had subject matter jurisdiction over this case because Sabri was charged with an "offense[] against the laws of the United States." 18 U.S.C. § 3231 (2000). See, e.g., United States v. Ryan, 41 F.3d 361, 363 (8th Cir. 1994) (en banc) (concluding that the express jurisdictional element contained in 18 U.S.C. § 844(i) was merely an element of the offense and that "the court [would] not by the failure of proof on that element [be] deprived of judicial jurisdiction"), cert. denied, 514 U.S. 1082 (1995).

expansive, unqualified language, both as to the bribes forbidden and the entities covered, does not support the interpretation that federal funds must be affected to violate" the statute. Id. at 56-57. Specifically, the Court noted that the word "'any,' which prefaces the business or transaction clause, undercuts the attempt to impose this narrowing construction," id. at 57, and "that, as a matter of statutory construction, § 666(a)(1)(B) does not require the Government to prove the bribe in question had any particular influence on federal funds," id. at 61.

The only issue before the Salinas Court, however, was a narrow question of statutory construction: whether "§ 666 [is] limited to cases in which the bribe has a demonstrated effect upon federal funds." Id. at 54 (emphasis added). The Court explicitly left open the more sweeping question of whether § 666 requires the government to demonstrate some other, less direct connection between the offense conduct and federal funds. Id. at 59 ("We need not consider whether the statute requires some other kind of connection between a bribe and the expenditure of federal funds, for in this case the bribe was related to the housing of a prisoner in facilities paid for in significant part by federal funds themselves."); see also United States v. Zwick, 199 F.3d 672, 679 (3d Cir. 1999) (stating that the Salinas Court resolved the question of whether the government must show that the offense conduct actually affected or involved federal funds but left open the question of whether § 666 requires some other connection between the offense conduct and the expenditure of federal funds). Several of our sister circuits have addressed this more broad question.

The Seventh Circuit has given § 666 a broad reading, ultimately concluding that "[i]t [was] not [its] part to trim § 666 by giving its text a crabbed reading." United States v. Grossi, 143 F.3d 348, 350 (7th Cir.), cert. denied, 525 U.S. 879 (1998). Likewise, the Sixth Circuit has concluded that "18 U.S.C. § 666 does not require a nexus between the alleged bribes and the federal funding." United States

v. Dakota, 197 F.3d 821, 826 (6th Cir. 1999).[4]  The Fifth Circuit also has eschewed any nexus requirement.  In United States v. Westmoreland, 841 F.2d 572 (5th Cir.), cert. denied, 488 U.S. 820 (1988), a county supervisor was convicted of accepting bribes and kickbacks in connection with her duty to purchase supplies for the county's highway construction projects.  Id. at 573-74.  The county received $222,949 in federal funds, but those funds were segregated and the alleged criminal activity did not affect or implicate federal monies.  Id. 575.  Nonetheless, the Fifth Circuit concluded that:

> [b]y the terms of section 666, when a local government agency receives an annual benefit of more than $10,000 under a federal assistance program, its agents are governed by the statute, and an agent violates subsection (b) when he engages in the prohibited conduct in any transaction or matter or series of transactions or matters . . . concerning the affairs of the local government agency.

Id. at 576 (internal quotation omitted).  The Fifth Circuit reaffirmed its position in United States v. Moeller, 987 F.2d 1134 (5th Cir. 1993), concluding that § 666 required only a nexus between the offense conduct and the agency receiving federal funds and that this nexus was satisfied by § 666(b).  Id. at 1137.  It confirmed its position more recently in United States v. Lipscomb, 299 F.3d 303 (5th Cir. 2002), in an opinion the court itself described as suffering from "tripartite fractionation."  Id. at 305 (Wiener, J.).  Despite their differences on other issues, see infra Part III. A., n.5, all members of the Lipscomb panel agreed that Westmoreland is still the law of

---

[4]Although the Sixth Circuit has applied Dakota as good law, it has questioned its validity.  See United States v. Suarez, 263 F.3d 468, 489 (6th Cir. 2001) (stating that if the court were writing on a clean slate, it "might well agree that proper application of 18 U.S.C. § 666 requires a minimal nexus between the alleged criminal activity and the federal funding received pursuant to that statute," but in light of Dakota, it was bound to conclude that § 666 requires no nexus), cert. denied, 535 U.S. 991 (2002).

the Fifth Circuit.  See id. at 313 (Wiener, J.), 354 (Duhé, J., concurring in part, dissenting in part), 365 (Smith, J., dissenting).

Two circuits, the Second and the Third, conclude that § 666 requires the government to prove at least some minimal nexus between the bribery and the federal benefits beyond that explicitly required in § 666(b).  See Zwick, 199 F.3d at 682 n.7; United States v. Santopietro, 166 F.3d 88, 93 (2d Cir. 1999).

In Santopietro, the Second Circuit recognized that Salinas limited its decision in United States v. Foley, 73 F.3d 484 (2d Cir. 1996), but concluded that it left untouched that part of Foley holding that § 666 "requires at least some connection between the bribe and a risk to the integrity of the federal funded program." Santopietro, 166 F.3d at 93.  The Foley Court reached the conclusion that § 666 required the government to prove a connection between the bribe and the federal funds only after finding the statute to be ambiguous and then turning to the legislative history to resolve that ambiguity.  Foley, 73 F.3d at 489.

Despite the long-standing principle of statutory construction that the title of a statute cannot control the plain language of the statute, the Third Circuit reasoned that the title of § 666, "Theft or bribery concerning programs receiving Federal funds," implied that the statute contains a minimal nexus requirement.  Zwick, 199 F.3d at 682.  It avoided the "literal interpretation" of the statute and instead relied upon legislative history to construct a "plausible, albeit more contextual[] alternative" reading.  Id. at 683.  It reasoned  that "Salinas found § 666(a)(1)(B) clear and unambiguous only on the question of whether the government must prove that the corrupt activity had a demonstrated effect on federal funds or programming," id. at 682 n.7, but that "nothing in Salinas prevent[ed it] from determining that § 666(a)(1)(B) is ambiguous on the issue of whether there is a federal connection requirement," id.  We respectfully disagree with the proposition that § 666 is ambiguous on the federal connection requirement.

As with any question of statutory construction, we look first to the text of the statute itself. United States v. McIntosh, 236 F.3d 968, 971 (8th Cir.), cert. denied, 532 U.S. 1022 (2001). Section 666(a)(2) makes it a crime to "corruptly give[], offer[], or agree[] to give anything of value to any person, with intent to influence or reward an agent of a[] . . . local . . . government, . . . or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more" if the "organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of Federal assistance." 18 U.S.C. § 666 (emphasis added). The plain language encompasses the activity of local agents wherever subsection (b) attains. There is no qualification that the prohibited conduct must have some relation to federal funds. Indeed, the statute proscribes the conduct of local agents in connection with "any" agency business or transaction. The word "any" is unambiguous and unqualified. Salinas, 522 U.S. at 57; Mo. Mun. League v. F.C.C., 299 F.3d 949, 955 (8th Cir. 2002) (citing cases and stating that time and time again the Court has held that the modifier "any" prohibits a narrow construction of a statute), petition for cert. filed (Feb. 18, 2003) (No. 02-1238); Westmoreland, 841 F.2d at 576 ("[T]he relevant statutory language [is] plain and unambiguous."); United States v. McCormack, 31 F. Supp. 2d 176, 186 (D. Mass. 1998) (stating Salinas "announced that the statutory language, 'in connection with any business or transaction,' is not ambiguous," that "[t]he language is clear," and that "the reach of the statute is clearly broad"). It is clear to us that the plain text of the statute does not require any connection between the federal funds received by the agency and the offense conduct. The statute applies to all offense conduct involving anything of value of $5000 or more that involves "any" agency business, transaction, or series of transactions so long as the relevant agency received the requisite amount of federal benefits ($10,000) within the defined time period as required in § 666(b).

The argument that § 666 is unambiguous as to the narrow question answered in Salinas but ambiguous as to the broad question presented here is unpersuasive. "A statute can be unambiguous without addressing every interpretive theory offered. . . . It need only be plain to anyone reading the Act that the statute encompasses the conduct at issue." Salinas, 522 U.S. at 60 (internal quotation omitted). Thus, while it is true that the Salinas Court held only that the government need not prove that the offense conduct directly affected federal funds, the Salinas Court's characterization of the operative terms of the statute as broad and unqualified supports our conclusion that the statute is also unambiguous as to the broader question presented here. See Salinas, 522 U.S. at 56 (stating that "[t]he enactment's expansive, unqualified language" does not support a limiting interpretation of the statute), 57 ("The prohibition is not confined to a business or transaction which affects federal funds."), 57 ("Furthermore, the broad definition of the 'circumstances' to which the statute applies provides no textual basis for limiting the reach of the bribery prohibition."), 57 ("The statute applies to all cases in which an 'organization, government, or agency' receives the statutory amount of benefits under a federal program."), 57 ("The statute's plain language fails to provide any basis for limiting § 666(a)(1)(B) to bribes affecting federal funds."). The Court reaffirmed this broad reading of § 666 in Fischer v. United States, 529 U.S. 667 (2000). There, the court described § 666 as "expansive, both as to the conduct forbidden and the entities covered." Id. at 678 (internal quotations and alteration omitted).

The fact that the Salinas Court construed § 666(a)(1)(B) and that this case involves § 666(a)(2) makes no difference in our analysis. Section (a)(1) and section (a)(2) are complementary provisions: one section criminalizes the solicitation or acceptance of bribes while the other criminalizes the offering or giving of bribes. Both provisions, however, prohibit bribery in connection with "any business, transaction, or series of transactions" of organizations which receive the requisite amount of federal benefits required in subsection (b). Neither provision suggests that the business or transaction in question must somehow implicate a federal program.

9

For the point under consideration here, the relevant terms of the two sections are identical. Therefore, relying on the text of the statute and the Supreme Court's characterization of the operative language in the statute as broad and unqualified, we conclude that § 666 is unambiguous as to the question presented here.

Generally, where the text of a statute is unambiguous, the statute should be enforced as written, McIntosh, 236 F.3d at 972, and "[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language," United States v. Albertini, 472 U.S. 675, 680 (1985) (internal quotation omitted). We find no extraordinary showing of contrary intent that warrants deviation from the plain text of the statute. Congress enacted § 666 to "safeguard finite federal resources from corruption and to police those with control of federal funds." U.S. v. Rooney, 37 F.3d 847, 851 (2d Cir.1994); see also S. Rep. No. 98-225, at 370 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3511 ("[T]he purpose of this section [is] to protect the integrity of the vast sums of money distributed through federal programs."). Prior to the enactment of § 666, however, the task of protecting the integrity of federal funds was made more difficult because of gaps in the statutory scheme. Specifically, prior to the enactment of § 666:

> thefts from other organizations or governments receiving federal financial assistance [could have been] prosecuted under the general theft of federal property statute, 18 U.S.C. 641, only if it [could have been] shown that the property stolen [was] property of the United States. In many cases, such prosecution [was] impossible because title ha[d] passed to the recipient before the property [was] stolen, or the funds [were] so commingled that the federal character of the funds [could not] be shown. This situation [gave] rise to a serious gap in the law, since even though title to the monies may have passed, the federal government clearly retain[ed] a strong interest in assuring the integrity of such program funds.

S. Rep. No. 98-225, at 369, reprinted in 1984 U.S.C.C.A.N. at 3510; see also United States v. Ferrara, 990 F. Supp. 146, 149-50 (E.D.N.Y. 1998) ("Moreover, [prior to the

10

enactment of § 666,] successful prosecutions were impossible in those instances where title to the federal property had passed to a recipient before the property was stolen, or where the federal character of the funds was irredeemably lost due to commingling with non-federal monies."). Section 666 was passed to fill the gaps in the prior anticorruption scheme. Westmoreland, 841 F.2d at 577 (stating that Congress specifically chose to protect the integrity of federal funds "by enacting a criminal statute that would eliminate the need to trace the flow of federal monies and that would avoid inconsistencies caused by the different ways that various federal programs disburse funds and control their administration"). Congress decided that the most effective way to insure the integrity of federal funds disbursed to sub-national agencies was to change the enforcement paradigm from one that monitored federal funds to one that monitored the integrity of the recipient agencies. Fischer, 529 U.S. at 678 ("Coupled with the broad substantive prohibitions of subsection (a), the language of subsection (b) reveals Congress's expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs."); United States v. Simas, 937 F.2d 459, 463 (9th Cir.1991) ("By enacting section 666, Congress plainly decided to protect federal funds by preserving the integrity of the entities that receive the federal funds rather than requiring the tracing of federal funds to a particular illegal transaction."); Westmoreland, 841 F.2d at 578 ("Congress seeks to preserve the integrity of federal funds by assuring the integrity of the organizations or agencies that receive them.").

The legislative history reveals that § 666 was drafted and enacted to "extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds," Salinas, 522 U.S. at 58 (emphasis added), and not to limit the scope of the federal bribery prohibition. In addition, because § 666 changed the focus of federal anticorruption efforts from policing federal funds to policing the agencies that receive and administer those funds, the argument that there must be a nexus between the offense conduct and the federal funds beyond that explicitly provided for in § 666(b) seems inconsistent with the statute. In any event,

11

in light of the foregoing legislative history we conclude, at minimum, that there is no clear or extraordinary showing of contrary legislative intent sufficient to cause us to override the text of a statute unambiguous on its face.

While we recognize that in construing statutes courts should avoid constitutional questions where possible, we note that even if we were to conclude that § 666 contained an unstated nexus requirement between the offense conduct and the federal funds, that would not dispose of the lurking constitutional question. Simply concluding that the statute contains an undefined nexus requirement ignores the constitutional question of whether Congress had the power to enact this statute at all. No amount of creative interpolation could save a statute that Congress lacked the authority to enact. United States v. Morgan, 230 F.3d 1067, 1073 (8th Cir. 2000) (Bye, J., concurring) ("Judicial efforts to render § 666 palatable by adding an element to the crime cannot alter our Constitution's basic limitation on federal legislative power. No amount of creative drafting permits the judiciary to preserve a statute that Congress plainly lacked the power to create."), cert. denied, 534 U.S. 825 (2001). Because we conclude, however, that § 666 as construed is a law necessary and proper to the execution of the Spending Power, see infra Part III.B., we need not worry about limiting the scope of a plainly written statute.

Given the plain and unambiguous language of the statute and the absence of any extraordinary contrary legislative history which suggests that we should deviate from the text, we are compelled to conclude that other than the threshhold showing that the agency in question received more than $10,000 in federal benefits in any one-year period, § 666 imposes no requirement that there be a connection between the offense conduct and the federal funds. See Morgan, 230 F.3d at 1073 (Bye, J., concurring) (concluding that a federal nexus requirement should not be read into § 666 on the grounds that the court should not inject elements into plain and unambiguous statutes); George D. Brown, Stealth Statute--Corruption, The Spending Power, and the Rise of 18 U.S.C. § 666, 73 Notre Dame L. Rev. 247, 280-81 (1998)

12

("[I]t is impossible to deny that the actual statute is the antithesis of narrow. Fairly read, it gives the federal government authority to deal with a range of malfeasance anywhere within governmental . . . entities that benefit from a variety of programs, whether or not the wrongdoing is connected to the federal assistance.").

III.

Having determined that the statute does not require a nexus between the criminal activity and the federal funds, we now turn to the question of whether Congress had the power to enact § 666. We review this federal constitutional question de novo. United States v. Shepherd, 284 F.3d 965, 969 (8th Cir. 2002).

**A.      Section 666 is not a condition placed on the receipt of federal funds.**

It is axiomatic that "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." United States v. Morrison, 529 U.S. 598, 607 (2000). The courts that have applied § 666 agree that Congress enacted § 666 pursuant to its spending powers. See, e.g., Fischer, 529 U.S. at 689-90 n.3 (Thomas, J., dissenting); McCormack, 31 F. Supp. 2d at 186 n.18 (collecting cases). The spending power is encompassed in Art. I., § 8, cl. 1, of the Constitution. Pennhurst State Sch. v. Halderman, 451 U.S. 1, 9 n.5 (1981). It provides that the "Congress shall have Power To . . . provide for the . . . general Welfare of the United States." U.S. Const. art. I, cl. 1. The Supreme Court has "repeatedly characterized . . . Spending Clause legislation as much in the nature of a contract: in return for federal funds, the recipients agree to comply with federally imposed conditions." Barnes v. Gorman, 122 S. Ct. 2097, 2100-01 (2002) (internal quotation and alteration omitted). The government argues that § 666 can be sustained as a valid condition placed on the receipt of federal funds. We disagree.

13

While traditional Spending Clause legislation is in the "nature" of a contract, it is not a contract. Mo. Child Care Ass'n v. Cross, 294 F.3d 1034, 1041 (8th Cir. 2002). Instead, "contract" is used only metaphorically to illuminate and explain certain aspects of the relationship formed between the federal government and the recipient of the federal funds. We find this metaphor useful to our discussion here, and we note that § 666 has none of the hallmarks of a contractual relationship which characterizes typical Spending Clause legislation.

Unlike typical Spending Clause enactments, § 666 imposes no affirmative obligation on the recipient of federal funds. Cf. South Dakota v. Dole, 483 U.S. 203, 205 (1987) (sustaining 23 U.S.C. § 158 (1982 ed. Supp. III), which directed the Secretary of Transportation to withhold a certain percentage of federal highway funds from states which had not yet made it illegal for a person under age 21 to purchase or possess alcohol, as a valid condition on the receipt of federal funds); Pennhurst, 451 U.S. at 12-13 (noting that under the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 89 Stat. 486, the recipient of federal funds had to take "'affirmative action' to hire qualified handicapped individuals," submit a plan evaluating services offered under the Act, and provide the federal government with assurances that each person serviced in the program had a habilitation plan); Fullilove v. Klutznick, 448 U.S. 448, 474 (1980) ("Congress has frequently employed the Spending Power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal . . . directives. This Court has repeatedly upheld against constitutional challenge the use of this technique to induce governments and private parties to cooperate voluntarily with federal policy."), 474 ("The program conditions receipt of public works grants upon agreement by the state or local governmental grantee that at least 10% of the federal funds will be devoted to contracts with minority businesses."), overruled on other grounds by Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995).

14

Nor does § 666 proscribe conduct of the recipient of the federal funds. Cf. Barnes, 122 S. Ct. at 2101 n.1 (concluding that valid Spending Clause legislation can include legislation that "simply prohibits certain discriminatory conduct." (internal quotation and alteration omitted)); Gonzaga Univ. v. Doe, 122 S. Ct. 2268, 2272-73 (2002) (describing the Family Educational Rights and Privacy Act of 1974, 88 Stat. 571, as a conditions statute which authorizes the withholding of federal funds from educational institutions that permit the release of education records without the consent of the students); Davis v. Monroe County Bd. of Ed., 526 U.S. 629, 638 (1999) (discussing Title IX of the Education Amendments of 1972, 86 Stat. 373, which prohibits sex-based discrimination under any education program receiving federal financial assistance); Lau v. Nichols, 414 U.S. 563, 566 (1974) (upholding application of the Civil Rights Act of 1964, 78 Stat. 241, which prohibits discrimination in any program or activity receiving federal financial assistance).

As such, § 666 has no contractual "terms" with which the recipient of federal funds must comply. Barnes, 122 S. Ct. at 2101 ("Just as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress's power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the 'contract.'" (internal quotation and alteration omitted)). We conclude therefore that § 666 is not a conditions statute at all and that the traditional Dole analysis is inapplicable here. United States v. Cantor, 897 F. Supp. 110, 113 (S.D.N.Y. 1995) ("18 U.S.C. § 666 does not impose a condition on the receipt of federal funds. The statute neither requires a state's compliance with federal regulatory or administrative directives, nor prevents state action. . . . Section 666 does not derogate any state right. . . . Section 666 does not force the state government to do anything." (internal citations and quotations omitted)), aff'd 141 F.3d 1152 (2d Cir.), cert. denied, 525 U.S. 814 (1998).

The fact that § 666 directly regulates the conduct of third parties and not the recipients of the federal benefits supports our conclusion that this is not a conditions

statute at all. Morgan, 230 F.3d at 1074 (Bye, J., concurring) ("In enacting § 666, . . . Congress did not contract with states or local governments. . . . Section 666 reaches beyond punishment of the state and local governments who receive those funds to proscribe the conduct of third persons who aren't parties to the funding contract."); Cantor, 897 F. Supp. at 113 ("All Congress has done in Section 666 is to pass a law making the conduct of individuals, not the state, criminal." (internal quotations omitted)). We could find no persuasive or authoritative case law supporting the proposition that Congress, acting pursuant to its power to attach conditions to the receipt of federal funds, has the authority to directly regulate the conduct of third parties who are not actually the recipients of the federal funds.[5] Instead, the case law demonstrates that funding condition statutes may only directly regulate the recipients of the federal funds who then may or may not undertake action vis-a-vis third parties. See, e.g., Davis, 526 U.S. at 640 ("[I]n return for federal funds, the States agree to comply with federally imposed conditions." (internal quotation omitted) (emphasis added)), 641 (affirming statute because it was drafted in such a way that "[t]he Government's enforcement power may only be exercised against the funding recipient." (emphasis added)); Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286 (1998) ("The two statutes [Title VI and Title IX] operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." (emphasis added)); Dole, 483 U.S. at 206 ("Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the

_____

[5]The Fifth Circuit recently addressed the question of whether § 666 can be sustained as a condition on the receipt of federal funds. The panel could not generate a majority for any position. Judge Wiener opined that § 666 was similar to a cross-cutting condition–one that applies to all grants of federal money–and applied the Dole conditions analysis. Lipscomb, 299 F.3d at 318-23 (Wiener, J., writing separately as to Part V. B.). Judge Duhé did not reach the issue because, he argued, it was not raised at trial or on appeal. Id. at 360 (Duhé, J., concurring in part and dissenting in part). Judge Jerry E. Smith concluded that § 666 "does not qualify as a conditional-grant statute." Id. at 366 (Smith, J., dissenting).

power to further broad policy objectives by conditioning receipt of federal moneys upon <u>compliance by the recipient</u> with federal . . . directives." (emphasis added) (internal quotations omitted)); <u>Oklahoma v. United States Civil Svc. Comm'n</u>, 330 U.S. 127, 144 (1947) ("The offer of benefits to a state by the United States dependent upon <u>cooperation by the state</u> with federal plans . . . is not unusual." (emphasis added)). Accordingly, we conclude that § 666 cannot be sustained as a condition attached to the receipt of federal funds because this statute is not a conditions statute at all. Section 666 is merely a general criminal statute which directly regulates the conduct of persons who are not parties to the funding "contract."

**B.     Section 666 is a necessary and proper exercise of Congressional power.**

Our conclusion that this statute is not a conditions-type statute does not necessarily render it infirm. Indeed, the Supreme Court has intimated that § 666 is a constitutional exercise of Congress's legislative power. <u>See</u> <u>Salinas</u>, 522 U.S. at 60 ("[T]here is no serious doubt about the constitutionality of § 666(a)(1)(B) as applied to the facts of this case."), 61 ("We simply decide that . . . § 666(a)(1)(B) does not require the Government to prove the bribe in question had any particular influence on federal funds and that under this construction the statute is constitutional as applied in this case."). Our brother Bye has previously concluded that the above quoted sentences are mere "constitutional speculations." <u>Morgan</u>, 230 F.3d at 1072 n.3. We find it significant that no member of the unanimous <u>Salinas</u> Court disagreed with or qualified these statements. In addition, in <u>Fischer</u>, the Court resolved another issue of statutory construction arising under § 666, and no member of the Court suggested that the statute might be constitutionally infirm. We think it ill-advised to now declare that § 666 is void ab initio as being outside of Congress's legislative domain after the Supreme Court has twice indicated that the statute can be constitutional as applied. With that thought in mind, we look beyond the Spending Clause to other provisions of the Constitution which may or may not provide legal authority to sustain § 666.

17

So that the Constitution "be not a splendid bauble," the framers of our government inserted the Necessary and Proper Clause into the Constitution to "remove all doubts respecting the right to legislate on that vast mass of incidental powers which must be involved in the constitution." M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 420-21 (1819). The Clause provides that "[t]he Congress shall have Power . . . To make all Laws which shall be necessary and proper for carrying into Execution" all the powers vested in the Government of the United States. U.S. Const. art. I, § 8, cl. 18. Both the Spending Power and the Necessary and Proper Clause are contained in section 8 of the first Article, and the Necessary and Proper Clause applies to the spending power, enabling Congress to enact all laws which are convenient to the exercise of disbursing federal funds. Fullilove, 448 U.S. at 474 ("[T]he power to 'provide for the . . . general Welfare' is an independent grant of legislative authority, distinct from other broad congressional powers."); Buckley v. Valeo, 424 U.S. 1, 90 (1976) ("[T]he General Welfare Clause . . . is . . . a grant of power, the scope of which is quite expansive, particularly in view of the enlargement of power by the Necessary and Proper Clause."); M'Culloch, 17 U.S. at 421. We recognize that the Necessary and Proper Clause does not confer upon the Congress a broad police power. It does, however, allow Congress the luxury to choose from an array of means with which to implement its enumerated powers, including its Spending Power. Chief Justice Marshall has best articulated the relationship between constitutional means and ends: "[l]et the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." M'Culloch, 17 U.S. at 421.

Applying the M'Culloch framework, we conclude that § 666 is a law necessary and proper to the execution of Congress's spending power. See United States v. Edgar, 304 F.3d 1320, 1325 (11th Cir.) ("[W]e are persuaded that a basis for the enactment of § 666 may be found in Congress's authority, under the Necessary and Proper Clause, to protect its capacity to fruitfully exercise the spending power."), cert.

18

denied, 123 S. Ct. 679 (2002); United States v. Bigler, 907 F. Supp. 401, 402 (S.D. Fla. 1995) ("Article I, § 8 gives Congress the power to 'provide for the ... general Welfare.' This power, in conjunction with the necessary and proper clause, gives Congress the power to enact § 666. In doing so, Congress did not violate the principle of federalism, nor did it violate the tenth amendment."). First, we think it an incontestable proposition that the disbursement of federal funds to subnational agencies to advance the general welfare is a legitimate end within the scope of the Constitution. We further quickly conclude that Congress also has a legitimate right to protect these disbursements from misappropriation once made. We also conclude that § 666 is consistent with and does not contravene the letter or spirit of the Constitution.[6] The difficult question in this case is whether § 666 is an appropriate

---

[6]The dissent argues that this law is not "proper," that is, it contravenes the letter and spirit of the Constitution by failing to recognize constitutional principles of limited federal government and state sovereignty. In support of this argument, the dissent relies on Alden v. Maine, 527 U.S. 706 (1999), Printz v. United States, 521 U.S. 898 (1997), and New York v. United States, 505 U.S. 144 (1992), for the proposition that "[f]ederal laws that usurp the traditional domain of state authority are . . . not proper." Post at 4. We, respectfully, are of the view that the dissent reads these cases too broadly. Alden, Printz, and New York answer only the limited question of when the central government is prohibited from acting directly on the States or on the States' officers. See Alden, 527 U.S. at 712 ("We hold that the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts."); Printz, 521 U.S. at 935 (holding that Congress cannot compel State officers to administer federal regulatory program); New York, 505 U.S. at 149 (holding that Constitution does not confer upon Congress the power to compel the States to enact a regulatory program). These cases merely recognize the larger constitutional principle that "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States," and that "where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts it lacks the power directly to compel the States to require or prohibit those acts." New York, 505 U.S. at 166; accord Alden, 527 U.S. at 714; Printz, 521 U.S. at 919-20. None of these cases addresses the question presented here: whether Congress has the

means plainly adapted to achieving Congress's end.  The resolution of this inquiry raises two subsidiary questions: (1) whether Congress has the power to enact criminal legislation pursuant to the Necessary and Proper Clause, and if so, (2) whether § 666 is plainly adapted, i.e., rationally related, to achieving Congress's end.

As to the first question, we have no doubt that the creation of a general criminal law incident to a constitutional end is within the sovereign power of the federal government.  M'Culloch, 17 U.S. at 418 ("The good sense of the public has pronounced, without hesitation, that the power of punishment appertains to sovereignty, and may be exercised, whenever the sovereign has a right to act, as incidental to his constitutional powers.").  Chief Justice Marshall provided concrete examples of the scope of this power in M'Culloch:

> Take, for example, the power 'to establish post-offices and post-roads.' This power is executed, by the single act of making the establishment. But, from this has been inferred the power and duty of carrying the mail along the post-road, from one post-office to another. And from this implied power, has again been inferred the right to punish those who steal letters from the post-office, or rob the mail. . . . This right is indeed essential to the beneficial exercise of the power, but not indispensably necessary to its existence. So, of the punishment of the crimes of stealing or falsifying a record or process of a court of the United States, or of perjury in such court. To punish these offences, is certainly conducive to the due administration of justice.

Id. at 417.  More recently, our court has recognized that Congress has the authority to pass a criminal law of general application pursuant to the Necessary and Proper

---

authority to regulate the conduct of individuals, not States, who deal with organizations that receive federal benefits.  Because there has been no clear signal from the Supreme Court that there are independent federalism-based limits on the power of Congress to regulate the conduct of individuals, we conclude that this statute is "proper" and does not contravene the letter or spirit of the Constitution.

Clause. See United States v. Dittrich, 100 F.3d 84, 87 (8th Cir. 1996) ("A law making it a crime to steal property from a Post Office is well within even the narrowest construction of the Necessary and Proper Clause."), cert. denied, 520 U.S. 1178 (1997); see also Dropps v. United States, 34 F.2d 15, 18 (8th Cir. 1929) ("That Congress has power under the constitution to enact a law punishing bribe taking on the part of officers of the United States and others acting in an official capacity for the United States is patently within its general powers to make all laws necessary and proper for carrying into execution the particular powers specifically conferred upon it."), cert. denied, 281 U.S. 720 (1930). These authorities demonstrate that Congress has the authority to enact general criminal legislation incident to its specifically enumerated powers.

As to the more specific question, we conclude that § 666 is a means plainly adapted, i.e., rationally related, to achieving the efficacious expenditure of federal funds and is, therefore, a law necessary and proper to the execution of the spending power. In M'Culloch, Chief Justice Marshall determined that "necessary" had an expansive meaning. The Clause does not restrain Congress's choice of means to only those means that are absolutely or indispensably necessary to the exercise of its powers. Rather, the Necessary and Proper Clause allows Congress to exercise its discretion in choosing particular means that may not be "necessary" in the strict sense of the word, but instead are convenient or conducive to the exercise of its powers. The Legal Tender Cases, 110 U.S. 421, 441 (1884) ("Where various systems might be adopted . . . , it might be said, with respect to each, that it was not necessary, because the end might be obtained by other means. Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the constitution."); M'Culloch, 17 U.S. at 420. Thus, Chief Justice Marshall, relying on his expansive interpretation of "necessary," concluded that the power to establish post offices and post roads included the power to establish criminal penalties for interfering with the mail. Likewise, he concluded that the federal government could incorporate a National Bank even though that

21

power is not enumerated in Article I. Chief Justice Marshall concluded that these so-called "implied powers" were constitutional exercises of the sovereign power because each reasonably advanced an enumerated power. M'Culloch thus teaches us that Congress may use means which are unspecified in the text of the constitution to achieve enumerated ends where there is a rational relationship between the means and the ends. Here, we know the end is the efficacious disbursement of federal funds. To determine whether § 666 is rationally related to that end we must look to Congress's intent in passing the law and the specific mechanisms by which § 666 hopes to achieve the desired end.

As we have discussed above, § 666 was designed to protect the integrity of the vast sums of federal monies disbursed through federal programs. Section 666 could have been more narrowly crafted to more directly advance this goal, for example, by criminalizing the theft of the federal funds themselves while in the hands of the recipient, or by requiring a direct nexus between the offense conduct and a federal program, but "[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality to perform its function." Yakus v. United States, 321 U.S. 414, 425 (1944) (internal quotation and alteration omitted). Here, Congress has made a determination that the most effective way to protect the integrity of federal funds is to police the integrity of the agencies administering those funds. As discussed in Part II, a more limited statutory scheme was rendered toothless because of the difficulty of tracing federal funds once they had been disbursed. In addition, we note that "money is fungible and its effect transcends program boundaries." Grossi, 143 F.3d at 350. The maladministration of funds in one part of an agency can affect the allocation of funds, whether federal or local in origin, throughout an entire agency. Thus, to suggest that corruption involving a discrete department or section of an agency that does not itself receive federal funds or administer a federal program can have no effect on the integrity or efficacy of a federal program is to ignore the fact that money is fungible and that federal funds are often comingled with funds from other sources. Section 666 addresses this problem

22

by policing the integrity of the entire organization that receives federal benefits. In sustaining the constitutionality of § 666 under the Necessary and Proper Clause , the Eleventh Circuit recently has come to the same conclusion. See Edgar, 304 F.3d at 1327 ("It is reasonable for Congress to conclude that any corruption of such recipient organizations, regardless of whether the corruption involves the misappropriation of specifically federal funds, endangers the comprehensive programs in which the organizations participate, and thus the effective exercise of the Congressional spending power as well.").

The Court has approved this type of indirect enforcement mechanism in another context. In Westfall v. United States, 274 U.S. 256 (1927), the Supreme Court affirmed the constitutionality of the Federal Reserve Act, 38 Stat. 259, as amended, 40 Stat. 232, which made it a crime to misapply the funds of a State bank that was a member of the Federal Reserve System. The reasoning of the Court is persuasive on the issue presented in this case:

> The argument is that Congress has no power to punish offences against the property rights of State banks. It is said that the statute is so broad that it covers such offenses when they could not result in any loss to the Federal Reserve Banks. . . . [I]f a State bank chooses to come into the System created by the United States, the United States may punish acts injurious to the System, although done to a corporation that the State also is entitled to protect. . . . That there is such a System and that the Reserve Banks are interested in the solvency and financial condition of the members also is too obvious to require a repetition of the careful analysis presented by the Solicitor General. The only suggestion that may deserve a word is that the statute applies indifferently whether there is a loss to the Reserve Banks or not. But every fraud like the one before us weakens the member bank and therefore weakens the System. Moreover, when it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so.

Id. at 258-59 (internal citations omitted).  As in Westfall, the government here has an interest in ensuring that the  system of subnational agencies that administer federal funds remains strong even where there is not a direct loss to the federal funds themselves.  Congress could well have determined that an agency official who is willing to take a bribe in the disbursements of nonfederal program money is not a person who should be entrusted with federal program funds either.

Any concern that we may have had regarding the scope of this law is allayed by the statute itself.  The statute is self-limiting to ensure that "federal regulatory power [does not] tag along after federal money like a hungry dog."  Morgan, 230 F.3d at 1074 (Bye, J., concurring) (internal quotations and emphasis omitted).  Section 666(b) is a jurisdictional provision that ensures in each particular case that the federal power will be exercised only where the federal government has a substantial interest at stake and where substantial federal funds may be at risk.  See Fischer, 529 U.S. at 689 n.3 (Thomas, J., dissenting) ("Title 18 U.S.C. § 666(b) is, after all, a jurisdictional provision that allows federal prosecution only if the specific organization at issue received more than $10,000 in 'benefits.'"), id. at 690 n.3 ("Without a jurisdiction provision that would ensure that in each case the exercise of federal power is related to the federal interest in a federal program, § 666 would criminalize routine acts of fraud or bribery.").  The $10,000 threshold requirement and the $5000 transactional requirement create a sufficient nexus between the offense conduct and federal funds to ensure that federal power will not be extended to the prosecution of merely local matters that may not jeopardize in any significant manner the integrity of federal programs.

More importantly, were we to conclude that Congress lacked the authority to legislate in this area, then the protection of federal funds would be left to the whim of state and local officials–perhaps even the same officials who pose a threat to the integrity of the federal funds in the first place and who therefore possess a strong

24

disincentive to protect them. The proposition that the federal government is powerless to vindicate its own interests is clearly untenable:

> "The government of the Union, though limited in its powers, is supreme within its sphere of action. No trace is to be found in the constitution of an intention to create a dependence of the government of the Union on those of the states, for the execution of the great powers assigned to it. Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishment of its ends. To impose on it the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution."

Logan v. United States, 144 U.S. 263, 283 (1892), quoting M'Culloch, 17 U.S. at 424. We reject it.

Accordingly, we hold that § 666 is a legitimate exercise of Congress's undisputed power to make a law that is necessary and proper for the carrying out of its enumerated power to provide for the general welfare of the United States.

IV.

To the extent that the district court held that 18 U.S.C. § 666 requires no nexus between the offense conduct and federal funds beyond that required in subsection (b), the judgment of the district court is affirmed. We reverse that part of the district court's judgment finding § 666 is facially unconstitutional. We remand this case to the district court for reinstatement of the indictment and for such further proceedings not inconsistent with this opinion.

BYE, Circuit Judge, dissenting.

No one doubts the constitutional authority of Congress to enact criminal laws punishing behavior affecting tangible federal interests. However, when Congress seeks to punish conduct with no connection to federal interests, conduct traditionally punished only by state and local governments exercising their general police powers, Congress exceeds its constitutional authority. The statute we review today, 18 U.S.C. § 666(a)(2), punishes a broad swath of conduct bearing little relationship to any federal interest. It establishes federal criminal liability for those who bribe state and local government officials, provided only that the government receives $10,000 per year in federal program benefits. Id. § 666(a)(2), 666(b). A briber need not handle, manage, administer or supervise the receipt or disbursement of federal funds, and the purpose of the bribe need not relate to federal program benefits. It is therefore logically and legally untenable to assert a federal interest in punishing these bribers.

In my view, the majority's decision to uphold § 666(a)(2) despite this infirmity swims against the tide of governing law. A wave of recent Supreme Court decisions emphasizes Congress' limited ability to federalize criminal conduct, United States v. Morrison, 529 U.S. 598 (2000), United States v. Lopez, 514 U.S. 549 (1995), and to interfere in matters traditionally left to state governance, Alden v. Maine, 527 U.S. 706 (1999), Printz v. United States, 521 U.S. 898 (1997). These decisions guide my review of § 666(a)(2) and require my respectful dissent.

I

I do agree with the majority in one important respect: section 666(a)(2) cannot be justified solely as an exercise of Congress' Spending Clause authority. The majority properly rests this holding upon the absence of any statutory link between the bribe and the state or local government's receipt or use of federal benefits. Because § 666(a)(2) does not link the bribe to federal benefits, the statute

26

encompasses and punishes conduct well beyond Congress' ability to "provide for the . . . general Welfare of the United States." U.S. Const. Art. I, § 8, cl. 1. Indeed, the statute's breadth leads to absurd results: only by injecting a new element into the statute can a court forestall the conviction of a person who bribes the city meat inspector while the city parks department receives $10,000 in federal benefits. See United States v. Santopietro, 166 F.3d 88, 93 (2d Cir. 1999). The majority wisely rejects the supposed Spending Clause moorings of § 666(a)(2).

Had the majority stopped at this point, I would have joined its opinion. The majority continues onward, however, reaching beyond its Spending Clause analysis and "resort[ing] to the last, best hope of those who defend ultra vires congressional action, the Necessary and Proper Clause." Printz, 521 U.S. at 923. The majority apparently casts aside its earlier qualm that § 666(a)(2) requires no connection between the bribe and federal benefits. The majority instead perceives a bare, "rational relationship" between punishing bribers and maintaining the integrity of federal programs, and on that basis declares the Necessary and Proper Clause a proper font of congressional authority. This may be correct, but it answers only half the question we must decide.

II

In my view, the principal defect in the majority opinion is its inattention to the conjunctive "and" that separates the words "necessary and proper." The majority advances several arguments suggesting § 666(a)(2) is "necessary," in the sense envisioned in M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 420-21 (1819). But the majority fails to ask—let alone resolve—whether the statute is also "proper." This is not merely a semantic dispute, for in Printz and Alden the Supreme Court advanced an interpretation of "proper" that calls into question the constitutionality of federal statutes that trespass upon the domain of state and local legislative power. Section 666(a)(2) is one such statute.

M'Culloch holds that Congress enjoys broad powers to select the means of enacting its objectives. Id. at 421. Thus, in determining whether a law is "necessary," courts must review Congress' law-making efforts with considerable deference. The majority describes this deference in terms of rationality: courts may not demand of Congress anything more than a rational relationship between its chosen means and ends. This reading of M'Culloch is, of course, received wisdom. Applying M'Culloch in this fashion, the majority makes a fairly convincing argument that the "fit" between § 666(a)(2) and Congress' underlying objective to preserve the integrity of federal programs is rational. However, because there is a rational relationship between Congress' aim and the law it enacted, under M'Culloch, the law is "necessary." But M'Culloch says very little, if anything, about what makes a law "proper." That specific question largely evaded the Court's attention until Printz and Alden.

Printz began bridging this doctrinal gap by drawing upon a law review article that develops a legal and historical distinction between "necessary" laws and "proper" ones. Gary Lawson & Patricia B. Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L.J. 267 (1993). Printz rejected the argument that Congress could commandeer state officials to implement certain federal mandates by using its Necessary and Proper Clause power to effectuate its Commerce Clause authority. 521 U.S. at 923-24. Relying solely on its understanding of what constitutes a "proper" law, the Court held the Necessary and Proper Clause forbids Congress from enacting legislation that intrudes on state sovereignty.

> When a "La[w] . . . for carrying into Execution" the Commerce Clause violates the principle of state sovereignty reflected in [the Constitution,] it is not a "La[w] . . . *proper* for carrying into Execution the Commerce Clause," and is thus, in the words of The Federalist, "merely [an] ac[t] of usurpation" which "deserve[s] to be treated as such."

28

Id. (emphasis in original; internal citations omitted). Like Printz, Alden recognized the word "proper" restricts the scope of legislative power. Alden continued the Court's analysis of "proper" laws by rejecting the argument that the Necessary and Proper Clause conferred authority on Congress to subject unconsenting states to suit in state court "as a means of achieving objectives otherwise within the scope of the enumerated powers." 527 U.S. at 732.

The Court's analysis in Printz and Alden rested entirely upon the propriety of a statute, not whether that statute was necessary. A law is "proper," the Court maintained, if it respects both the Constitution's limits on federal power and its grants of power to the states and the people. Printz, 521 U.S. at 918-22, 923-24. These cases teach us that a law is "proper" for the enforcement of an enumerated power only if it hews to constitutional principles of limited federal government and state sovereignty. Federal laws that usurp the traditional domain of state authority are therefore not "proper."

I believe § 666(a)(2) lies outside the guideposts erected in Printz and Alden for assessing a "proper" law. The statute intrudes upon state and local concerns by federalizing anticorruption law, which is traditionally the domain of state and local legislation. See United States v. Bass, 404 U.S. 336, 349 (1971) ("Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. This congressional policy is rooted in the same concepts of American federalism that have provided the basis for judge-made doctrines. . . . [W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction.") (internal citations omitted) (cited in Lopez, 514 U.S. at 561 n.3). Section 666(a)(2) thereby offends the Constitution's basic limitations on federal power. The only possible relationship between § 666(a)(2) and federal interests is the sum of $10,000 in federal benefits received each year by state or local governments. There is scarcely any limit to this relationship, however. Even under a narrow view of "federal benefits," Fischer

v. United States, 529 U.S. 667, 681 (2000), it is beyond dispute that every state—and nearly every county, tribe and city—receives that sum in yearly federal benefits. Moreover, the statute requires no connection between those federal benefits and the bribe. The lack of any connection makes all too real the risk that federal anticorruption efforts will swamp state and local efforts to combat bribery.

The majority suggests the federal interest in punishing bribery of state and local government officials is at least as great as the federal interest in punishing those who misapply funds belonging to state banks. Westfall v. United States, 274 U.S. 256, 258-59 (1927). But the statute in Westfall included an element establishing a federal interest in every prosecution—the state bank had to be a member of the Federal Reserve System. Misapplication of a bank's funds weakened the entire membership of the Reserve, so the Supreme Court could easily identify the federal interest in protecting each bank's assets. Westfall therefore adds nothing to the majority's argument. If anything, Westfall proves my point: Congress cannot enact criminal laws absent a quantifiable federal interest in punishment.

Both the majority and the Eleventh Circuit in United States v. Edgar, 304 F.3d 1320, 1326 (11th Cir. 2002), sanction this federalization of anticorruption law. They all but admit that once the federal government provides $10,000 in yearly benefits to a state or local government, the federal government obtains an ongoing interest in the entire structure and operations of state and local governments, and in the credibility and integrity of their agents. Congress may, in effect, regulate (in this case, criminalize) many activities that tangentially threaten that structure, credibility or integrity. The real-world effects are truly startling. It is now a *federal* crime for an auto mechanic to induce a public high school principal to hire him to teach shop class by offering free car repair. This federalization of anticorruption law erodes the Constitution's limits on federal power.

The majority's sweeping view of the Necessary and Proper Clause calls to mind Congress' unbounded deployment of its Commerce Clause authority before Lopez and Morrison. Both Lopez and Morrison curtailed federal power, forbidding Congress from piling "inference upon inference" to demonstrate a relationship between crimes and federal interests. Lopez, 514 U.S. at 566; Morrison, 529 U.S. at 615. I fear Congress relied upon similarly weak and attenuated inferences in enacting § 666(a)(2). For many of the same concerns articulated in Lopez and Morrison, I am troubled by the majority's efforts to interpret the Necessary and Proper Clause to permit the federalization of criminal laws. "Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur." Lopez, 514 U.S. at 577. This is precisely what makes § 666(a)(2) not "proper."

I recognize, of course, § 666(a)(2) does not preempt state or local power to punish corruption. Even though § 666(a)(2) lacks preemptive effect, the sheer size and funding of the federal government's criminal justice machinery suggests the possibility of state and local anticorruption efforts dwindling. It blinks at reality to believe § 666(a)(2) does no more than provide an additional weapon in the anticorruption arsenal. By inserting itself into a domain traditionally reserved for state and local prosecutions, the federal government treats state governments, for example, not with the respect and dignity due them as "residuary sovereigns and joint participants in the Nation's governance," Alden, 527 U.S. at 748-49, but as untrustworthy organs incapable of policing their own. The development and enforcement of sound ethical standards, and of political accountability to citizens for failing to do so, lies at the very heart of sovereignty. See Printz, 521 U.S. at 920 ("The Constitution thus contemplates that a State's government will represent and remain accountable to its own citizens."); New York v. United States, 505 U.S. 144, 168-69 (1992).

31

Section 666(a)(2) upsets the delicate balance between federal and state authority that animates our Constitution.  See id. at 921; Alden, 527 U.S. at 751. "Congress has no more power to punish theft from the beneficiaries of its largesse than it has to punish theft from anyone else. . . . The Constitution does not contemplate that federal regulatory power should tag along after federal money like a hungry dog." United States v. Morgan, 230 F.3d 1067, 1074 (8th Cir. 2000) (Bye, J., specially concurring) (quoting David E. Engdahl, The Spending Power, 44 Duke L.J. 1, 92 (1994)).

### III

I do not believe § 666(a)(2) validly "carr[ies] into [e]xecution" Congress' Spending Clause authority because the statute sweeps within its ambit a wide range of criminal activity bearing little or no relation to federal interests.  I am not alone in this view.  Even the government disavowed reliance on the Necessary and Proper Clause when the question first arose at oral argument.  The government never urged our court to uphold § 666(a)(2) on the strength of Congress' Necessary and Proper Clause power, and, when pressed, the government expressed considerable discomfort with such a notion.  For the reasons expressed above, I share the government's discomfort with this argument, and therefore respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.