# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————

No. 07-1062

—————

United States of America,      *
         *

         Plaintiff - Appellee,     *
         *   Appeal from the United States
     v.              *   District Court for the
         *   District of Minnesota.
Gary Dean Zimmermann,     *
         *

         Defendant - Appellant.     *

—————

Submitted: September 24, 2007
Filed: December 17, 2007 (Corrected: 12/20/2007)

—————

Before MURPHY, MELLOY, and SMITH, Circuit Judges.

—————

MURPHY, Circuit Judge.

A jury found Gary Dean Zimmermann guilty of three counts of accepting a gratuity in violation of 18 U.S.C. § 666(a)(1)(B). He appeals, arguing that there was insufficient evidence to support the verdict and that the district court[1] abused its discretion by limiting the number of defense witnesses. We affirm.

—————————————

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

I.

Gary Dean Zimmermann represented the sixth ward on the Minneapolis City Council from 2002 until 2005 and was one of the six members on the council's zoning and planning committee. The boundaries of the sixth ward were redrawn in a 2002 redistricting plan which did not include Zimmermann's residence. He and fourteen other plaintiffs sued to set aside the plan, and they incurred approximately $100,000 in legal fees by the time of the acts charged in the indictment.

Real estate developer Gary Carlson was planning a multimillion dollar mixed use project known as Chicago Commons on the edge of the sixth ward. His concept was to have condominiums on the upper floors and service oriented retail stores on the ground level, such as a grocery, coffee shop, and dry cleaner. Carlson estimated that his potential profit from the project would be eight million dollars. One of the problems he faced, however, was that the zoning classification for the property would permit only two retail spaces in the building and this would limit his ability to market the project as a full service living environment. In order to obtain more retail space, Carlson submitted a rezoning application to the city planning department in the fall of 2004. Such an application would be reviewed by a staff member who would then make a recommendation on it to the city planning commission which would give its assessment to the council's zoning and planning committee on which Zimmermann sat. Zimmermann's committee would then recommend to the city council whether the application should be granted.

Carlson recognized that his rezoning application faced opposition due to neighborhood resistance to additional retail in the area. Although his Chicago Commons project was located in the eighth ward, it was right across the street from Zimmermann's sixth ward and an establishment known as Village Market. Village Market was an indoor bazaar at 24th Street and Chicago Avenue which catered to the Somali-American community. This market and its surrounding area had experienced

-2-

problems of overcrowding, poor management, violence, and drug trafficking. The fact that the owner of Village Market, Azzam Sabri, had originally been involved in the development of Chicago Commons contributed to a neighborhood group's opposition to additional retail space for the project because of concern that the project would attract similar problems to those plaguing Village Market.

Carlson met Zimmermann at city hall in the fall of 2004, and the two saw each other again a few months later, but on neither occasion did they engage in substantive conversation. During their third meeting at a groundbreaking ceremony, however, Zimmermann solicited $100,000 from Carlson for the legal bill he and the other plaintiffs had incurred in their unsuccessful challenge to the redistricting plan. When Carlson offered to negotiate with the plaintiffs' attorney for a reduced fee, Zimmermann lowered the amount of his request, saying that $40,000 would "make [the attorney] go away." On May 20, 2005 Carlson and Zimmermann ran into each other again, and Zimmermann asked whether Carlson had given further thought to their previous discussion about money. Carlson told Zimmermann that he could help, and Zimmermann stressed that the issue was urgent. Carlson stated that this conversation prompted him to contact the FBI the next business day and that he then began acting as a cooperating witness.[2] All his further conversations with Zimmermann were undertaken and recorded at the direction of the FBI.

On June 6, 2005 Carlson attended a fundraiser for Zimmermann at the Black Forest Inn. While wearing a wire, Carlson requested Zimmermann's help to lobby planning commission members in advance of the upcoming vote on his rezoning application. Zimmermann agreed, and Carlson responded that he would "give [Zimmermann] some help." Carlson asked Zimmermann what he could do to help, and Zimmermann replied "money, money, money." Zimmermann suggested that the

---

[2]Carlson had first approached the FBI on May 3, 2005 to report corruption involving the Minneapolis city government unrelated to the issues here.

-3-

redistricting lawsuit attorney would likely write off the entire bill but that a donation by Carlson of four to five thousand dollars would demonstrate good faith. They agreed to keep Carlson's contribution between the two of them. Carlson then proposed "Okay. You give me your vote, get me that vote, and get me my help through there, I'll take care of you. Okay?" Zimmermann replied, "Okay. You got it." Later Zimmermann talked about trying to raise more money for his campaign and referred to the contribution limit of $300 per person. He suggested having Carlson donate in the names of his "cousins."

On June 14, 2005 Carlson and Zimmermann met at a Minneapolis restaurant. Carlson wore both a hidden camera and an audio recording device. At the beginning of their conversation, Carlson handed Zimmermann $5,000 and stated "Before I forget, Dean. Ah. This is for that attorney thing or whatever we talked about." The video showed Zimmermann taking the money and putting it in his pocket and recorded Carlson saying "So, use it what [sic] you want." The rest of the conversation focused on Carlson's rezoning issue and what could be done at the zoning and planning committee in light of the planning commission's decision to recommend denial of his zoning application. The two also discussed ways to infuse money into Zimmermann's campaign.[3] Zimmermann suggested using straw donors and having Carlson pay them a little extra to say that the contributions came from them.

The zoning and planning committee recommended denying Carlson's rezoning request on July 14, 2005. Zimmermann did not arrive at the meeting until after the vote was taken on Chicago Commons, but he was present when the city council unanimously denied Carlson's application on July 23. During a conversation on August 3, Carlson referred to the $5000 he had given Zimmermann and asked what had prevented his rezoning application from passing the zoning and planning

---

[3]Zimmermann had moved into the new sixth ward so that he could run again for sixth ward council member.

committee. Zimmermann explained there had been strong opposition to additional retail in the area due to its proximity to the Village Market and the problems associated with it.

On August 15, 2005 Zimmermann and Carlson met at a potential site for a new Somali mall. The site was located approximately a mile from Chicago Commons at East Franklin and Cedar Avenue. Carlson wanted to develop the new Somali mall to divert merchants and business away from Village Market in an effort to eliminate opposition to his Chicago Commons rezoning application. Carlson and Zimmermann talked about the issues involved in receiving city approval for the new mall and Carlson asked for Zimmermann's help in getting the project through the city council. During this discussion Carlson gave Zimmermann $1200 in campaign contribution envelopes with the names of four straw donors. Carlson told Zimmermann that he had given the "donors" a little extra so that they would verify that the contributions were theirs.

Carlson went to Zimmermann's home on August 31, 2005. While there Carlson gave Zimmermann $1000 in an unmarked campaign contribution envelope and suggested that the money was from people who wanted Zimmermann reelected. Carlson told Zimmermann to write in the donor names himself and stated, "That's for getting us the zoning over there," referring to the zoning for the development of the new Somali mall. Zimmermann replied "So . . . alright."

Zimmermann went to Chicago Commons on September 8, 2005 to meet with Carlson but instead found two FBI agents who wanted to talk with him. The agents asked him about the payments from Carlson. Zimmermann denied having received any money from Carlson and claimed that he had instructed Carlson to send money for the redistricting lawsuit directly to the plaintiffs' attorney. The agents warned Zimmermann not to lie. At point Zimmermann admitted that he had received $1200 in campaign donation envelopes from Carlson but claimed that he still had the

funds because he had had suspicions about the validity of the contributions. The agents then showed him the video of his June 14 meeting where he had accepted $5000 from Carlson. Zimmermann admitted that he had accepted that money in addition to the $1200 he had previously acknowledged. He again stated that he had not received any other funds from Carlson. After being confronted with the recording of the August 31 meeting, he admitted that he had in fact received an additional $1000. He claimed that all of the funds were in a desk drawer at his home.

On January 18, 2006 a federal grand jury returned a four count indictment against Zimmermann. Each count alleged that Zimmermann knowingly and corruptly solicited something of value with intent to be influenced or rewarded in connection with business with the government of the City of Minneapolis in violation of 18 U.S.C. § 666(a)(1)(B). Count one involved the $5000 that Zimmermann received from Carlson regarding his rezoning application for Chicago Commons. Counts two and three pertained to the $1200 and $1000 payments that Zimmermann received from Carlson related to obtaining city approval for a new Somali mall. Count four concerned a 2004 request by Zimmermann to have a retaining wall constructed without cost.[4]

Zimmermann's jury trial began on July 31, 2006. The government called Carlson and the FBI agents as witnesses and introduced the audio and video recordings of Carlson's meetings with Zimmermann and of Zimmermann's FBI interview. The agents testified about their execution of a search warrant at Zimmermann's house; the only money they found there was the $1200 in campaign contribution envelopes. Zimmermann's campaign treasurer testified that Zimmermann

---

[4]After a constituent group asked Zimmermann to sign a certificate of completion for a townhouse development, he asked if the group could construct a retaining wall for one of his neighbors. The group responded that it could not afford to build it, and Zimmermann then asked for leftover building materials so he could construct the wall himself.

had never mentioned anything about the $1200 and $1000 contributions. Larry Leventhal, the plaintiffs' redistricting attorney, testified that Zimmermann had told him that he had received a $5000 contribution to the redistricting lawsuit fund. There was also evidence from which the jury could find that Zimmermann spent the $5000 and $1000 payments on personal expenses.

In addition to testifying on his own behalf, Zimmermann called sixteen witnesses, eight of whom offered "constituent-related testimony" intended to show that he lacked the predisposition to accept a bribe and was therefore entrapped by the government. Each of the constituent witnesses testified that he or she had worked with Zimmermann to obtain assistance with matters involving the city and that he had never asked for anything in return. Zimmermann had intended to call thirteen constituent witnesses, but the government objected to further cumulative testimony after the first five testified. The district court decided that three more would be sufficient.

The jury convicted Zimmermann of counts one, two, and three and acquitted him on count four. The district court sentenced him to thirty months on each count, to be served concurrently. Zimmermann now appeals.

## II.

Zimmermann argues that the government did not present sufficient evidence from which a reasonable jury could find one of the elements of the charged offenses and that his convictions under 18 U.S.C. § 666(a)(1)(B) must therefore be overturned. He claims that there was insufficient evidence that he had corruptly solicited any thing of value of $5000 or more as the statute requires.[5] On a claim of insufficient evidence

---

[5]Section 666(a)(1)(B) reads

[w]hoever . . . [being an agent of a state or local government or agency

we review the trial evidence "in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." United States v. Spencer, 439 F.3d 905, 913 (8th Cir. 2006) (citation omitted).

Zimmermann contends that the statute requires that the recipient of federal funds, in this case the City of Minneapolis, must have expended $5000 in considering Carlson's rezoning application for the value element to be satisfied. The plain language of the statute does not readily lend itself to such a narrow interpretation, however, and case law forecloses it.

To support his argument Zimmermann relies on a 1996 Second Circuit decision overturning a § 666(a)(1)(B) bribery conviction on the basis that there was no evidence that the value of the legislation sought had a $5000 value *to the State of Connecticut*. United States v. Foley, 73 F.3d 484, 493 (2d Cir. 1996) (emphasis added). The Supreme Court rejected this narrow construction of the statute the next year in Salinas v. United States, 522 U.S. 52, 61 (1997), holding that "§ 666(a)(1)(B) does not require the government to prove the bribe in question had any particular influence on federal funds . . . ." We have already recognized that Salinas governs the issue Zimmermann raises. United States v. Sabri, 326 F.3d 937, 943 (8th Cir. 2003), aff'd, 541 U.S. 600 (2004). Salinas and Sabri make it clear that the government was not required to prove that the city had spent at least $5000 in considering Carlson's application.

---

thereof] corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more . . . shall be fined under this title, imprisoned not more than 10 years, or both. 18 U.S.C. § 666(a)(1)(B).

-8-

Zimmermann next argues that the things of value alleged in counts one, two, and three did not satisfy the statutory requirement that they be worth $5000 or more. We have not had occasion to decide how the $5000 value requirement in § 666(a)(1)(B) can be met, but other courts have employed several valuation methods. See, e.g., United States v. Fernandes, 272 F.3d 938, 944 (7th Cir. 2001) ($5000 element satisfied because total bribes were greater than that and defendant received additional things of value); United States v. Zwick, 199 F.3d 672, 689-91 (3d Cir. 1999) (value of development, potential tax benefits, permit fees, and paid bribes satisfied value element), abrogated on other grounds by Sabri v. United States, 541 U.S. 600, 604-08 (2004); United States v. Mills, 140 F.3d 630, 633 (6th Cir. 1998) (considering only the amounts of the charged bribes); United States v. Marmolejo, 89 F.3d 1185, 1193-94 (5th Cir. 1996) (employing "traditional valuation methods" and recognizing intangibles as things of value).

Zimmermann's indictment alleged that the thing of value in count one was the rezoning application for the Chicago Commons project and that the gratuity paid for his assistance in obtaining the rezoning classification was $5000. Under any of the various valuation methods which have been employed by other circuits, the amount of the gratuity itself can satisfy the thing of value element if it is $5000 or more. See, e.g., Fernandes, 272 F.3d at 944 (reasoning that the value of the bribes alone could satisfy the value element). Since the gratuity alleged in count one met the $5000 value requirement and the evidence at trial was sufficient to prove it, no additional inquiry is needed as to that count.

Whether the value element was also satisfied for counts two and three, which alleged gratuities of $1200 and $1000 respectively, presents a different issue. The indictment alleges that the thing of value associated with both counts is the "development of a retail mall catering to Minneapolis's Somali-American community." Intangible benefits have been held to satisfy the value requirement elsewhere. See United States v. Marmolejo, 89 F.3d at 1192 (listing cases construing

"anything of value" in criminal statutes to include intangibles).  In determining the value of intangibles the Marmolejo court looked to "traditional valuation methods." Id. at 1194, citing United States v. Mongelli, 794 F. Supp. 529, 531 (S.D.N.Y. 1992). Establishing the actual value of the intangible benefit is one such traditional method. See Marmolejo, 89 F.3d at 1194; Mongelli, 794 F. Supp. at 531.

The government presented evidence that the development of a new Somali mall in a different neighborhood could ease the neighborhood resistance to additional retail at Chicago Commons by attracting tenants and customers away from Village Market and improve the likelihood of the approval of Carlson's rezoning application.  There was evidence that the value of a rezoned Chicago Commons project was worth millions of dollars to Carlson.  The eighty one condominiums he hoped to sell had an estimated value of $200,000 each, and Carlson's ability to market them effectively depended upon obtaining a rezoning classification to permit additional retail space. Since there was sufficient evidence that the benefit to Carlson from the gratuities paid to Zimmermann for the development of a new Somali mall was of greater value than $5000, the jury could reasonably find Zimmermann guilty of those counts.

Zimmermann also argues that the government presented insufficient proof that a quid pro quo was intended in his dealings with Carlson and that he cannot be found guilty of accepting payments for official actions that would have been taken regardless of whether Carlson paid him.  Section 666(a)(1)(B) prohibits both the acceptance of bribes and the acceptance of gratuities intended to be a bonus for taking official action.  See 18 U.S.C. § 666(a)(1)(B) ("corruptly solicits or demands . . . intending to be influenced or rewarded"); see, e.g., United States v. Griffin, 154 F.3d 762, 763 (8th Cir. 1998) (difference between bribe and gratuity is that a quid pro quo arrangement is required for a bribe but not for a gratuity).  Zimmermann was indicted for, convicted of, and sentenced for accepting gratuities rather than bribes.  Compare U.S.S.G. § 2C1.1 (bribes) with id. § 2C1.2 (gratuities).  The government therefore was not required to prove any quid pro quo.

III.

Zimmermann next argues that he was entrapped as a matter of law because the government did not produce sufficient evidence to sustain its burden to prove that he was predisposed to commit the criminal acts. We review sufficiency challenges to a jury verdict by taking the evidence "in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." Spencer, 439 F.3d at 913.

Entrapment occurs when a "government agent originated the criminal design, . . . implanted in the mind of an innocent person the disposition to commit the offense, and the defendant then committed the criminal act at the urging of the government agent." United States v. Williams, 109 F.3d 502, 508 (8th Cir. 1997), quoting United States v. Hulett, 22 F.3d 779, 781 (8th Cir. 1994). The "critical inquiry is whether the government agent caused or induced the defendant to commit a crime he was not otherwise predisposed to commit." Hulett, 22 F.3d at 781.

In order to be entitled to an entrapment instruction, a defendant must produce some evidence that the government induced him to commit an offense. United States v. Cannon, 88 F.3d 1495, 1504 (8th Cir. 1996). If the defendant makes this showing, the burden shifts to the prosecution to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime, United States v. Kendrick, 423 F.3d 803, 807 (8th Cir. 2005), and entrapment may become a question of fact for the jury to decide. United States v. Coleman, 284 F.3d 892, 894 (8th Cir. 2002). In this case the issue of entrapment was put to the jury which was instructed that the burden was on the government to prove that Zimmermann was predisposed to commit the crime.

The government presented ample evidence from which a jury could find beyond a reasonable doubt that Zimmermann was predisposed to accept a gratuity. The

-11-

evidence viewed in the light most favorable to the government revealed that Zimmermann approached Carlson before he became an FBI cooperating witness and solicited a substantial sum of money from him, purportedly to pay attorney fees for the redistricting lawsuit. When Carlson offered to negotiate a lower fee with the attorney, however, Zimmermann declined and instead lowered the amount of his request significantly. At a later meeting Zimmermann again asked about the money, indicating that his need was urgent. The government also offered relevant evidence related to the count on which Zimmermann was acquitted to show that he had requested free construction of a retaining wall from a constituent group before he ever met Carlson. See United States v. Long, 952 F.2d 1520, 1525 (8th Cir. 1991) (all evidence presented at trial may be considered when determining sufficiency of the evidence relating to intent, including evidence not resulting in conviction). The FBI recordings also show that Zimmermann initiated the idea of using straw donors for campaign donations and told Carlson how to go about it. Finally, Zimmermann's numerous lies during his FBI interview showed guilty knowledge and predisposition.

Viewing the evidence in the light most favorable to the government, there was sufficient evidence showing that Zimmermann was predisposed to accept a gratuity and was therefore not entrapped.

IV.

Finally Zimmermann argues that the district court abused its discretion by limiting the number of his constituent witnesses. He contends that this denied him the ability to counter the government's proof regarding an element of the entrapment defense – the lack of predisposition to accept a bribe. A trial court has broad discretion as to the number of witnesses a party may call on a point at issue. United States v. Koessel, 706 F.2d 271, 275 (8th Cir. 1983). We therefore review a district court's evidentiary rulings for abuse of discretion. United States v. Johnson, 463 F.3d

803, 808 (8th Cir. 2006). Even if the district court abused its discretion, we will uphold the conviction if any error was harmless. Id.

Zimmermann called eight witnesses who presented constituent related testimony for the purpose of establishing that he lacked the predisposition to accept a bribe. All of these witnesses testified that Zimmermann had never solicited a reward from them in the course of their interactions with him as a council member. Zimmermann wanted to call thirteen witnesses to support this proposition, but the government objected to the cumulative testimony after he called the first five. The district court limited Zimmermann to three additional constituent witnesses of his own choosing and allowed him to make an offer of proof as to what each of the other five witnesses would have testified. The proposition that Zimmermann sought to establish by calling all these witnesses was that he did not have the predisposition to accept a bribe since he had solicited none from them. We conclude from examining the testimony and Zimmermann's offer of proof that there would have been no appreciable difference in the evidence if the additional constituents had testified. The district court did not abuse its discretion in limiting the number of his testifying constituents to a total of eight.

V.

Accordingly, we affirm the judgment of the district court.

_____