PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

v.

PHILLIP A. HAMILTON,

        *Defendant-Appellant.*

⎫ No. 11-4847

ELECTRONIC PRIVACY INFORMATION
CENTER,

    *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(3:11-cr-00013-HEH-1)

Argued: October 24, 2012

Decided: December 13, 2012

Before MOTZ and FLOYD, Circuit Judges, and
Catherine C. EAGLES, United States District Judge
for the Middle District of North Carolina,
sitting by designation.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Floyd and Judge Eagles joined.

## COUNSEL

**ARGUED:** Charles B. Lustig, SHUTTLEWORTH, RUL-OFF, SWAIN, HADDAD & MORECOCK, PC, Virginia Beach, Virginia, for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Lawrence H. Woodward, Jr., SHUTTLEWORTH, RULOFF, SWAIN, HADDAD & MORECOCK, PC, Virginia Beach, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Robert J. Seidel, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. Marc Rotenberg, Alan Butler, David Jacobs, ELECTRONIC PRIVACY INFORMATION CENTER, Washington, D.C., for Amicus Supporting Appellant.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

A jury convicted Phillip A. Hamilton of federal program bribery and extortion under color of official right. The convictions arose from charges that, while a state legislator, Hamilton secured state funding for a public university in exchange for employment by the university. Hamilton appeals, challenging his convictions and sentence. For the reasons that follow, we affirm.

I.

From 1988 to 2009, Hamilton served as a member of the Virginia House of Delegates. Ultimately he became Vice Chairman of the Appropriations Committee, which is responsible for the state budget. While serving as a legislator, he also worked as an administrator and then as a part-time consultant for the Newport News public schools system.

In August 2006, Hamilton arranged to meet with officials from Old Dominion University, a public university located in Norfolk, Virginia, to discuss state funding for a new Center for Teacher Quality and Educational Leadership that Old Dominion wanted to establish. Immediately prior to the meeting, Hamilton and his wife exchanged emails discussing their financial difficulties, and hope that the new Center would employ Hamilton. In their email exchange, Hamilton told his wife that he would "shoot for" a salary of $6,000 per month. Those emails, like all subsequent emails at issue in this case, were sent to or from Hamilton's public school workplace computer, through his work email account.

The Dean of the College of Education at Old Dominion, Dr. William Graves, testified that, after the initial meeting with Hamilton, Old Dominion President Roseann Runte directed the Dean to hire Hamilton, saying, "[t]hat man wants a job, make him director or something." Hamilton emailed his wife that the meeting "went well" and that he had "reinforced" the idea that "if and when an employment opportunity became available," he would like to be compensated "in the area of $6,000 per month." Hamilton also emailed Dean Graves and, after advising the Dean to "keep this under the radar," explained how best to obtain state funding for the Center. In this email, Hamilton further stated that, if funding for the Center was not included in the Governor's budget, "on my own, I will initiate legislation and/or a budget amendment to create such a center."

Four months later, on December 21, Hamilton emailed President Runte, reminding her of his interest in employment with the Center. The same day, Hamilton emailed David Blackburn, Director of Old Dominion's Program for Research and Evaluation in Public Schools, explaining that, because the Governor's budget did not include money for the Center, Hamilton had proposed a budget amendment to secure $1 million for the Center. Hamilton added: "My City retirement is reduced in May 2007. I will need to supplement my current

[public school] income . . . by at least an equal amount
. . . ." Director Blackburn replied: "Thanks for passing on
budget request and specific salary need[.] I believe GA [Gen-
eral Assembly] will fund and you will be on board[.]"

Soon thereafter, Hamilton introduced legislation for the
first of two $500,000 appropriations for the Center, both of
which ultimately passed. Director Blackburn emailed Hamil-
ton: "Are congratulations in order? Are you our new direc-
tor?" In response, Hamilton reiterated his salary needs, noting
"[o]f course, more than that is always appreciated." Director
Blackburn then posted an announcement for the Center Direc-
tor position, but did not interview any of the three applicants
for the position. Instead, Hamilton was selected as Center
Director, at a salary of $40,000 per year, even though he had
not filed an application for the position. Dean Graves testified
that, but for Hamilton's legislative assistance, the Center
would not have offered Hamilton the position. Hamilton later
suggested "flowing the money" for his Center employment
through the school system payroll and generally concealing
his position as Director of the Center. Hamilton explained at
one point in an email to Blackburn, "looks like they are dig-
ging."

On the basis of the above evidence, the Government
charged Hamilton with bribery concerning federal program
funds in violation of 18 U.S.C. § 666(a)(1)(B) (2006), and
extortion under color of official right in violation of 18 U.S.C.
§ 1951 (2006). The jury convicted him of both crimes. The
district court then sentenced him to 114 months' imprison-
ment. Hamilton noted a timely appeal.

## II.

Hamilton's most substantial appellate argument challenges
the district court's admission into evidence of emails he sent
to and received from his wife. He maintains that the admis-
sion of these emails violated the marital communications priv-

ilege. We review evidentiary rulings, including rulings on privilege, for abuse of discretion, *see NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 501 (4th Cir. 2011), factual findings as to whether a privilege applies for clear error, and the application of legal principles de novo. *In re Grand Jury Subpoena*, 341 F.3d 331, 334 (4th Cir. 2003).

"Communications between . . . spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged." *Wolfle v. United States*, 291 U.S. 7, 14 (1934); *see also United States v. Parker*, 834 F.2d 408, 411 (4th Cir. 1987) (Powell, J.). This is so because "marital confidences" are "regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails." *Wolfle*, 291 U.S. at 14. But, of course, to be covered by the privilege, a communication between spouses must be confidential; "voluntary disclosure" of a communication waives the privilege. *Id.* at 14-15. The Government maintains that Hamilton waived the marital communications privilege by communicating with his wife on his workplace computer, through his work email account, and subsequently failing to safeguard the emails.

*Wolfle*, the leading marital communications privilege case to have reached the Supreme Court, provides an analogy useful in resolving Hamilton's privilege claim. In *Wolfle*, the Court held that a defendant's communication with his wife did not come "within the privilege because of [his] voluntary disclosure" of the communication "to a third person, his stenographer." 291 U.S. at 14. The Court explained that, "[n]ormally husband and wife may conveniently communicate without stenographic aid, and the privilege of holding their confidences immune from proof in court may be reasonably enjoyed and preserved without embracing within it the testimony of third persons to whom such communications have been voluntarily revealed." *Id.* at 16-17. Because "[t]he privilege suppresses relevant testimony," it "should be

allowed only when it is plain that marital confidence cannot otherwise reasonably be preserved," and "[n]othing in this case suggests any such necessity." *Id.* at 17.

In Hamilton's case, email has become the modern stenographer. Like the communications to the stenographer in Wolfle's time, emails today, "in common experience," are confidential. *See id.* at 15; *see also* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 413 (1999) (noting that email "pose[s] no greater risk of interception or disclosure than other modes of communication commonly relied upon as having a reasonable expectation of privacy" and so there is generally "a reasonable expectation of privacy in its use").

But just as spouses can "conveniently communicate without" use of a stenographer, they can also "conveniently communicate without" using a work email account on an office computer. *See Wolfle*, 291 U.S. at 16. Therefore, as in *Wolfle*, it is hardly "plain that marital confidence cannot . . . reasonably be preserved" without according the privilege to the spousal communications at issue here. *See id.* at 17. Accordingly, that one may generally have a reasonable expectation of privacy in email, at least before a policy is in place indicating otherwise, does not end our inquiry.

Hamilton ignores this guidance from *Wolfle* and focuses solely on the fact that, in 2006, when he used his workplace email system to send the emails for which he claims privilege, his public school employer had no computer usage policy. This is true, but the school system adopted a computer policy well prior to the 2009 investigation of, and 2011 charges against, Hamilton. The computer policy, as revised in 2008, expressly provides that users have "no expectation of privacy in their use of the Computer System" and "[a]ll information created, sent[,] received, accessed, or *stored* in the . . . Computer System is subject to inspection and monitoring at any time." Moreover, it is undisputed that forms accepting this policy were electronically signed in Hamilton's name, and

that Hamilton had to acknowledge the policy by pressing a key to proceed to the next step of the log-on process, every time he logged onto his work computer. The district court concluded that these facts established that Hamilton had waived any privilege he had in the emails.

Hamilton contends that he did not waive the privilege because he "had no reason to believe, at the time he sent and received the emails, that they were not privileged," and he could not waive his privilege retroactively. Amicus, the Electronic Privacy Information Center, adds that it seems "extreme" to "require an employee to scan all archived e-mails and remove any that are personal and confidential every time the workplace use policy changes," when "employees may not even be aware that archived e-mails exist or know where to find them." EPIC Br. at 18.

In an era in which email plays a ubiquitous role in daily communications, these arguments caution against lightly finding waiver of marital privilege by email usage. But the district court found that Hamilton did not take *any* steps to protect the emails in question, even after he was on notice of his employer's policy permitting inspection of emails stored on the system at the employer's discretion. As outlined above, the record provides ample support for these factual findings.

In similar circumstances, we have held that a defendant did not have an "objectively reasonable" belief in the privacy of files on an office computer after his employer's policy put him "on notice" that "it would be overseeing his Internet use." *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000); *see also In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 257 (Bankr. S.D.N.Y. 2005) (listing employer's maintenance of relevant usage policy, monitoring of employee email, third-party right of access to email, and employee's awareness of the policy as key factors suggesting no expectation of privacy). Our sister circuits have also made clear that a party waives the marital communications privilege when he "fails

to take adequate precautions to maintain . . . confidentiality." *See SEC v. Lavin*, 111 F.3d 921, 930 (D.C. Cir. 1997); *see also United States v. De La Jara*, 973 F.2d 746, 749-50 (9th Cir. 1992).

Thus, the district court's conclusion that the emails were not subject to the marital communications privilege constitutes no abuse of discretion. Rather, that conclusion accords with the admonition in *Wolfle* against freely extending the privilege to communications outside of which marital confidences can "otherwise reasonably be preserved," 291 U.S. at 17, and with the principle that one who is on notice that the allegedly privileged material is subject to search may waive the privilege when he makes no efforts to protect it.

### III.

We can more quickly resolve Hamilton's remaining contentions.

### A.

First, Hamilton challenges the sufficiency of the evidence. We uphold a jury verdict based on substantial, even if circumstantial, evidence, viewing the evidence in the light most favorable to the Government. *United States v. Stewart*, 256 F.3d 231, 249 (4th Cir. 2001). As Hamilton acknowledges, "[w]hen a defendant challenges the sufficiency of a jury's guilty verdict . . . he bears a heavy burden." Hamilton has not met that burden.

To establish the corrupt intent necessary for the convictions at issue here, the Government had to present evidence of "an exchange of money (or gifts) for specific official action." *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998). The Government did this, offering a broad range of evidence, admittedly much of it circumstantial, indicating that Hamilton used his position as a state legislator to obtain state

funds for the Center, in exchange for a paid position at the Center. Hamilton may be correct that "the Government produced no email, or witness, to say that Hamilton *communicated* to any one that he would not support funding for the research center unless he received a job in return." But intent can be implied—and it is the jury's role to make such factual inferences. *See United States v. Engle*, 676 F.3d 405, 418 (4th Cir. 2012). Thus, we find Hamilton's sufficiency of the evidence argument meritless.

## B.

Hamilton next argues that the district court committed reversible error in failing to instruct the jury on the difference between a bribe, which requires intent to engage in a quid pro quo, and a gratuity, which does not require corrupt intent, but only a "payment for or because of some official act." *See Jennings*, 160 F.3d at 1013 (internal quotation marks omitted). We review asserted jury instruction errors for abuse of discretion. *United States v. Shrader*, 675 F.3d 300, 308 (4th Cir. 2012). To demonstrate such abuse, Hamilton must establish that his proposed instruction was "(1) correct; (2) not substantially covered by the court's charge; and (3) deal[t] with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Id.*

In this case, the district court did not abuse its discretion in refusing to instruct the jury as to a gratuity. Hamilton's suggestion that this refusal could have caused confusion fails, for he concedes that the Government did not pursue a gratuity theory. The court properly instructed the jury on the specific requirements under § 666, including corrupt intent, which might not be required for gratuity. Thus, Hamilton can point to no confusion the jury may have faced as to the intent requirements of § 666 and his proposed instruction was "substantially covered by the court's charge."

Nor can Hamilton show that failure to give the requested instruction "seriously impaired" his defense. *See Shrader*, 675 F.3d at 308. Although we have not yet ruled as to whether § 666 covers gratuities as well as bribes, *see Jennings*, 160 F.3d at 1015, even if the statute does cover gratuities, failure to instruct on gratuity could not have prejudiced Hamilton in any way. Section 666 provides no less severe sentence for gratuities; thus instructing the jury as to gratuity would only have provided an additional ground on which to convict Hamilton. *See* 18 U.S.C. § 666.

## C.

Finally, Hamilton asserts two reasons why he believes the district court erred in its application of a fourteen-level sentencing enhancement. We review legal interpretations of the Sentencing Guidelines de novo. *United States v. McKenzie-Gude*, 671 F.3d 452, 462-63 (4th Cir. 2011). But when a defendant does not raise an argument in the district court, we review only for plain error. *United States v. Strieper*, 666 F.3d 288, 295 (4th Cir. 2012). "To establish plain error, the appealing party must show that an error (1) was made, (2) is plain (i.e., clear or obvious), and (3) affects substantial rights." *United States v. Lynn*, 592 F.3d 572, 577 (4th Cir. 2010). Moreover, we "may exercise . . . discretion to correct the error only if it seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

Hamilton initially argues, as he did in the district court, that in determining the proper sentencing enhancement, the court should have relied on the value of the payment he received—approximately $87,000—rather than the value of the benefit Old Dominion obtained. Yet Hamilton admits that the Sentencing Guidelines require that the enhancement be based on the *greater of* the payment received *or* the benefit obtained -- and there is no dispute the benefit to Old Dominion was greater than the payment Hamilton received. *See* U.S. Sen-

tencing Guidelines Manual § 2C1.1(b)(2) (2011). Accordingly, this argument fails.

Hamilton raises, for the first time on appeal, the additional argument that, in calculating his sentencing enhancement, the district court should have determined the benefit to Old Dominion based on the net, rather than the gross, value of the state appropriation Old Dominion obtained. *See* U.S.S.G. § 2C1.1 cmt. But, even if the district court did err in calculating the enhancement based on the full value of the first $500,000 payment that Old Dominion received, that error does not provide a basis for reversal on plain error review.

To succeed on a plain error argument, a defendant must demonstrate that any error affected his substantial rights, which here required Hamilton to demonstrate that the net benefit received by Old Dominion was $400,000 or less and so merited a lesser sentencing enhancement. *See* U.S.S.G. § 2B1.1(b)(1). Hamilton made no such showing. Indeed, in imposing the fourteen-level sentencing enhancement, the district court considered only the first $500,000 payment to Old Dominion. But the University actually received, and the district court could have considered, *two* $500,000 payments. Additionally, Hamilton has not shown that the district court plainly erred if it assumed the entire $500,000 Old Dominion received constituted the net benefit, given that Hamilton offered no evidence of some lesser portion of the $500,000 that was analogous to "profit." *Cf. United States v. Quinn*, 359 F.3d 666, 679-80 (4th Cir. 2004) (involving contracts for for-profit companies).

In sum, Hamilton has not demonstrated that the alleged error was plain or affected his substantial rights.

IV.

Because we find each of Hamilton's claims on appeal to be without merit, we affirm the judgment of the district court.

*AFFIRMED*