**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 18-4643**

─────────────

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

      v.

MICHAEL LYNN VAUGHN,

             Defendant - Appellant.

─────────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Paula Xinis, District Judge.  (8:17-cr-00125-PX-1)

─────────────

Submitted:  March 26, 2020                          Decided:  June 9, 2020

─────────────

Before GREGORY, Chief Judge, and FLOYD and HARRIS, Circuit Judges.

─────────────

Affirmed by unpublished per curiam opinion.

─────────────

Gerald C. Ruter, LAW OFFICES OF GERALD C. RUTER, P.C., Baltimore, Maryland,
for Appellant.  Robert K. Hur, United States Attorney, Baltimore, Maryland, Thomas P.
Windom, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for
Appellee.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

From 2015 to 2016, Maryland House Delegate and Defendant-Appellant Michael Vaughn received thousands of dollars in cash from liquor store owners. During this same period, Vaughn supported those store owners' preferred Sunday liquor sales legislation. Convicted by a jury of one count of conspiracy to commit bribery in violation of 18 U.S.C. § 371 and four counts of bribery in violation of 18 U.S.C. § 666(a)(1)(B), Vaughn appeals his conviction and sentence. For the following reasons, we affirm.

I.

This case turns on one elected official's role in a broader conspiracy to change the Sunday liquor laws of Prince George's County, Maryland. First elected to the Maryland House of Delegates in 2003, Vaughn represented District 24 of Prince George's County for fourteen years. During his tenure, he assumed various committee and leadership positions. Particularly relevant to this appeal, he served continuously on the Economic Matters Committee, and he served in Maryland House leadership as Deputy Majority Whip from 2006 until 2017. He served in county delegation leadership, including as Second Vice Chair of the Prince George's County Delegation from 2014 through 2017. He also served in leadership capacities specifically addressing liquor-related legislation. From 2003 to 2010, he served on the Alcoholic Beverages subcommittee. And in 2014, he served on his county delegation's Alcoholic Beverage work group.

During his time as a part-time liquor inspector, in 2002, Vaughn became friends with David Son. Son was also serving as a part-time liquor inspector and was intimately

2

involved with Prince George's County Korean Chamber of Commerce (the Chamber), which was run by liquor-store owner Jin Suk Seo. Several Korean American liquor store owners were involved with the Chamber, including Young Paig and Shin Lee. At the time, Prince George's County did not allow liquor sales on Sundays. Although Seo personally supported a 2014 bill to allow Sunday liquor sales, it did not receive the Chamber's seal of approval.

That bill was first introduced on February 6, 2014. Around February 12,[1] the Alcoholic Beverages work group finalized a ninety-page report (Work Group Report) in favor of Sunday liquor sales in the county. Vaughn voted against the bill as part of his county delegation on February 14, and as part of the House Economic Matters Committee on February 21. The bill failed.

Soon after, Son began working as a Maryland Senate liaison, meeting with Chamber-connected liquor store owners, including Seo, Paig, and Lee (collectively, the "Chamber members"), about how best to pass the Sunday liquor sales law. In late 2014, the group approached Vaughn to see about getting the legislation passed in the 2015 session. Vaughn was willing to support the legislation but wanted to be paid. According to Son's trial testimony, Vaughn initially said that he wanted $500 per month in perpetuity from the willing Chamber members. After negotiations, the Chamber members agreed to pay Vaughn $20,000 cash in four equal installments, to bookend the 2015 and 2016

_____

[1] There is a discrepancy in the record that we need not resolve as to whether the report was published on February 11 or February 12.

3

legislative sessions. First, they would pay $5,000 before the 2015 legislative session, and an additional $5,000 if the legislation passed; next, they would pay $5,000 before and after the 2016 legislative session.

The Chamber members hired attorney Matthew Gorman to draft the bill and lobby the state legislature. Gorman had represented businesses seeking liquor licenses, and he had admittedly paid kickbacks to Son for years, who referred him clients. As introduced in February 2015, House Bill 931 (Sunday Sales Bill) established 100 permits for businesses to sell liquor on Sundays in Prince George's County. The Prince George's County Board of License Commissioners (Liquor Board) would be responsible for issuing such permits. Permit applicants would be required to commit to investing $50,000 in their business during the year after the permit was issued.

On February 13, 2015, the Sunday Sales Bill was introduced into the House. As Son testified during Vaughn's trial, about thirty days into the legislative session, Vaughn asked for "seed money to get the legislation passed" to "convince some of his colleagues to vote in favor of the [Sunday Sales Bill.]" J.A. 218. Son spoke with Seo, who complied. Son, Seo, and Lee met Vaughn at a Starbucks, where Seo handed Vaughn $2,000 cash in the bathroom.

In Maryland, local bills are first voted on by the county delegation. Applying "local courtesy," the House will generally defer to the wishes of the local delegation. The Sunday Sales Bill was first considered and approved by the Law Enforcement subcommittee of the county delegation, of which Vaughn was not a member. On March 13, 2015, the bill went to the entire county delegation for a vote, and Vaughn voted in favor of the bill—changing

4

his vote from the prior year. With Vaughn's support, the 2015 bill passed and continued to the Economic Matters Committee of the House, where he again voted in favor of the bill, on March 20, 2015. The bill then went to the House floor, where Vaughn voted in favor for a third time, and it passed. The Senate passed the bill, and it was signed into law.

After their success, Son, Paig, and Lee met with Vaughn on April 22, 2015. At that meeting, Paig handed Vaughn a $5,000 cash installment. In his testimony, Son explained that the meeting was to "[m]ake sure that the $20,000 was being paid, a portion of that money being paid to show the appreciation of having the [Sunday Sales Bill] passed." J.A. 225.

With Gorman's help, Paig and Lee each applied for a Sunday Sales permit. While Paig and Lee's applications were pending, they once again met with Vaughn to let him know that they did not want their proximate competitors to receive Sunday Sales permits and asked for help in gaining a competitive advantage. Upon their request, Vaughn wrote a letter to the Liquor Board expressing that certain establishments close to their liquor stores should not receive a Sunday Sales permit. For example, Cox Liquors was a hundred feet away from Lee's store, and Vaughn opposed their permit in his letter. The plan worked: Cox Liquors did not receive a permit. And by October 2015, Paig and Lee each received a permit.

Soon thereafter, Vaughn asked to expedite his next $5,000 payment, so that he could pay his daughter's college tuition. Originally, the payment had been scheduled for just before the 2016 legislative session. On November 10, 2015, Son, Paig, Lee, and Vaughn met to discuss the advance. Paig and Lee agreed to advance the payment in exchange for

5

Vaughn's opposition to proposed bills that would expand the number of permits. Vaughn agreed, and was given the $5,000 cash advance. By this time, Gorman was cooperating with the FBI and had informed them of the meeting. Unbeknownst to the four attendees, a federal law enforcement agent was inside the restaurant. From that point on, there would be photos, audio, and video recordings of the co-conspirators, and of Vaughn receiving and depositing cash.

At a meeting on January 6, 2016, Vaughn complained to Son and Gorman, the latter of whom was wearing a wire, that he didn't "wanna seem . . . like a malcontent, but what we did, there's so many people benefitting, that only two that I know of are showing any appreciation [Paig and Lee]. All these . . . I mean they act like we had to do this. And David will tell you, it was a fight." S.J.A. R-7 (audio recording) at 00:17–36. Vaughn continued: "All these other mothers ridin' the gravy train. They gettin' fat and happy . . . but yet they act like this was something that had to be done. This sh*t didn't really . . . almost didn't go through." S.J.A. R-7 at 01:07–18. He explained that the people "riding the gravy train need to understand that this is a privilege and not a right," and "it could be taken away at any time." S.J.A. R-7 at 03:49–57.

During the 2016 legislative session, Son and Gorman spoke with Vaughn multiple times to discuss efforts against the expansion of Sunday Sales permits. They finally agreed to support a bill that would only increase the number of permits by five, called House Bill 1311 ("Additional Sunday Permits Bill" or "305," referring to the county bill number). In February of 2016, another legislator was holding up a different bill that Vaughn supported. That legislator was also in favor of the Additional Sunday Permits Bill, which was set to

6

come to the Economic Matters Committee. In order to move the other bill that he favored, Vaughn threatened to hold up the Additional Sunday Permits Bill, saying it "ain't out the woods yet." J.A. 358. Vaughn told Son on a phone call that he was planning to hold up the Additional Sunday Permits Bill.

The following week, on February 26, 2016, Vaughn met with Son and Gorman to discuss the holdup. Gorman brought money per Son's instructions. At that meeting, Vaughn also told Gorman, "305 is going to come out but you know sometimes you gotta send 'em a message," presumably referring to the legislator holding up Vaughn's other bill. S.J.A. R-15 (video recording) at 01:02–06. "You keep f***king with my sh*t but I'm not going to kill it." S.J.A. R-15 at 01:07–09. He then stated, "We're halfway through the session . . . so anything else that you might, you know, come across, that I can assist you, you know, not to rush you, but we need to go ahead . . . ." S.J.A. R-15 at 2:42–51. After further discussion about another corrupt politician, Gorman handed Vaughn $2,000 in cash. Vaughn said, referring to the Additional Sunday Permits Bill, "So they will be voting on Monday. And unless . . . like I said I was going to f**k with it. But I'm gonna just . . . I'm gonna lay down . . . I kinda got [elected official] on alert . . . So I ask [elected official] to just lay down." S.J.A. R-15 at 9:01–23.

Like the 2015 bill, the Additional Sunday Permits Bill was first considered by the Law Enforcement subcommittee of the county delegation, which issued a favorable report. Vaughn then voted for the bill, again three times: as a county delegate, as a member of the Economic Matters Committee, and on the floor of the House. On April 11, 2016, Vaughn called Son to see when he would receive his final payment of $5,000. Gorman separately

7

owed Vaughn $5,000, which he had promised in their prior meeting. That same day, Gorman met with Vaughn and gave him $5,000 in FBI funds, in a recorded meeting, for the passage of the Additional Sunday Permits Bill.

Ending its covert investigation, the FBI confronted Vaughn, who agreed to be interviewed. During that interview, Vaughn admitted that he accepted payments from Paig and Lee as "[a]ppreciation for the Sunday Sales legislation," J.A. 886–87, and for the letter to the Liquor Board. Vaughn said the payments were not a "this for that," but rather to "help himself out." J.A. 893. He explained, "I dug myself a hole." J.A. 892. At trial, the government introduced Vaughn's bank and credit card statements, showing that he was in debt.

Vaughn was federally indicted with one count of conspiracy to commit bribery, and four counts of bribery in violation of 18 U.S.C. § 666(a)(1)(B).[2] At the conclusion of the government's case, Vaughn's counsel moved for acquittal under Federal Rule of Criminal Procedure 29, without making any argument. The district court denied the motion. Defense counsel then put on two witnesses, each of whom testified that they had not noticed any untoward actions by Vaughn as to the bills. Vaughn did not testify.

The district court instructed the jury as to the elements of bribery under 18 U.S.C. § 666(a)(1)(B). Vaughn's counsel did not request an instruction as to gratuities, and the judge did not issue one. After his six-day trial, the jury convicted Vaughn on all five

---

[2] Vaughn was also indicted with counts of wire fraud, which the district court severed upon his request from this case.

8

counts.

At sentencing, the district court found two special offense characteristics that increased his offense level under the Sentencing Guidelines: a loss amount totaling more than $95,000 but less than $150,000, and an offense that involved more than one bribe. Vaughn did not receive points for accepting responsibility, although the district court considered his partial acceptance as a mitigating factor under 18 U.S.C. § 3353(a). Although the government requested a 120-month sentence and a fine, the court sentenced Vaughn to a 48-month sentence as to each count, to be served concurrently, and no fine.

Vaughn timely appealed his conviction and sentence.

## II.

We first consider Vaughn's challenges to his conviction. Rather than contend with the plain language of 18 U.S.C. § 666(a)(1)(B), Vaughn has framed his appeal around a distinction between bribery and gratuities. He is not the first appellant to do so in this Circuit. *See United States v. Hamilton*, 701 F.3d 404 (4th Cir. 2012). The result, then and now, is an appeal that works cross-purposes. First, Vaughn contends that there is insufficient evidence that he committed a bribery, yet concedes that he committed a gratuity. Second, Vaughn asserts that the district court should have *sua sponte* instructed the jury as to gratuity, which he claims is a lesser-included offense of § 666 bribery. But § 666 either criminalizes gratuities, as Vaughn conceives of them, or it does not. If it does, then he has admitted his guilt and, pursuant to the only penalty provided in § 666, may be imprisoned for up to 10 years; if it does not, then a gratuity is not a lesser-included offense

9

at all. Notwithstanding this problematic framing, we hold for the reasons stated below that the district court properly instructed the jury as to the elements of § 666(a)(1)(B), and that the jury's verdict is supported by substantial evidence.

A.

As this Court has previously explained, § 666—the "federal programs bribery" statute under which Vaughn was convicted, *see United States v. Tillmon*, 954 F.3d 628, 643–44 (4th Cir. 2019)—was enacted as a supplement to an existing federal bribery statute, 18 U.S.C. § 201, *United States v. Jennings*, 160 F.3d 1006, 1012–13 (4th Cir. 1998). Section 201 criminalizes "Bribery of public officials and witnesses," but a circuit split arose over "whether state and local officials could be considered 'public officials' under the general statute." *See id.* (citing S. Rep. No. 98-225, at 369 (1984)). "By enacting § 666 Congress supplemented § 201 to make clear that federal law prohibits 'significant acts of . . . bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program.'" *Id.* at 1013 (omission in original) (quoting S. Rep. No. 98-225, at 369).

Section 201 criminalizes both bribery and illegal gratuities, distinguishing between the two based on intent. *See id.* "Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act [i.e., a quid pro quo], while illegal gratuity requires only that the gratuity be given or accepted 'for or because of' an official act." *See United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404–05 (1999). Because gratuity is bribery without "corrupt intent," and is also criminalized by § 201, it is a lesser-included

10

offense of bribery under § 201. *See Jennings*, 160 F.3d at 1014; *see also* Fed. R. Crim. P.

31(c)(1) (an offense is lesser included if it is "necessarily included in the offense charged").

Under § 201, the penalties are also different for bribery and illegal gratuities. Bribery is

punishable by up to 15 years imprisonment, 18 U.S.C. § 201(b), whereas gratuities are

punishable by up to 2 years imprisonment, *id.* § 201(c).

By contrast, § 666 is not so neatly divided between bribery and gratuities.

Section 666, in relevant part, applies to state officials working for a government,

organization, or agency that receives federal assistance in excess of $10,000 per year. *See*

18 U.S.C. § 666(a)(1), (b). Vaughn was such a state official. Subparagraph (A)

criminalizes embezzlement, theft, and similar crimes related to government property,

which are distinct crimes from both bribery and gratuity. *See id.* § 666(a)(1)(A). Vaughn

was convicted under Subparagraph (B), which provides that any such official who:

> corruptly solicits or demands for the benefit of any person, or accepts or
> agrees to accept, anything of value from any person, intending to be
> influenced or rewarded in connection with any business, transaction, or series
> of transactions of such organization, government, or agency involving
> anything of value of $5,000 or more . . . shall be fined under this title,
> imprisoned not more than 10 years, or both.

*Id.* § 666(1)(B).

There is a circuit split as to whether § 666 criminalizes both bribery and illegal

gratuities, with most circuits holding that it criminalizes both. *See, e.g.*, *United States v.*

*Zimmermann*, 509 F.3d 920, 927 (8th Cir. 2007) (holding § 666 criminalizes gratuities);

*United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007) (same); *United States v. Agostino*,

132 F.3d 1183, 1195 (7th Cir. 1997) (same). *But see United States v. Fernandez*, 722 F.3d

1, 26 (1st Cir. 2013) (holding that § 666 does not criminalize gratuities). A third possibility is that § 666 criminalizes bribery along with something less than bribery, but greater than a gratuity as defined under § 201. This Court has yet to weigh in on this question. In *Jennings*, we reserved the issue for another day. 160 F.3d at 1017. Today, we do the same, because the answer cannot impact Vaughn's appeal.

On appeal, Vaughn admits that he is guilty of gratuities but argues that there was insufficient evidence to convict him of bribery. He also argues that the district court should have instructed the jury as to gratuity, which he claims is a lesser-included offense of § 666 bribery. This argument is counterintuitive, however, as Vaughn would only get relief if § 666 *does not* criminalize gratuities: If, as Vaughn argues, § 666 criminalizes both bribery and gratuities, then a person convicted for either act has committed the same offense—a violation of § 666—and is subject to the same penalty—up to 10 years' imprisonment. Because there is no free-floating gratuity offense that can be lesser-included and with which the jury could have convicted Vaughn, any instruction on gratuities "would only have provided an additional ground on which to convict" Vaughn. *See Hamilton*, 701 F.3d at 410. In other words, "even if" § 666 covers gratuities, the "failure to instruct on gratuity could not have prejudiced [Vaughn] in any way," because he has admitted to a gratuity, and § 666 "provides no less severe sentence for gratuities." *See id.*

Furthermore, the district court accurately instructed the jury as to the intent requirement of § 666(1)(B). Vaughn has not argued that an instruction on gratuities was warranted to avoid confusion; he insists that it is a lesser-included offense with which he may have been alternatively convicted. Wisdom of his appellate strategy aside, we are

assured that the district court's jury instruction did not confuse the jury, which simply had to decide whether Vaughn "intend[ed] to be influenced or rewarded." 18 U.S.C. § 666(1)(B). The district court did not err by failing to *sua sponte* instruct the jury as to a different offense, which was not lesser included to the offense charged.

B.

Second, Vaughn asserts insufficient evidence to maintain his conviction—again, focusing on § 666(1)(B)'s intent requirement. We review de novo the denial of a Rule 29 motion for judgment of acquittal based on insufficient evidence. *See United States v. Clarke*, 842 F.3d 288, 297 (4th Cir. 2016). Viewing the evidence in the light most favorable to the government, we sustain a guilty verdict that is supported by "substantial evidence," meaning "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)).

Viewing the evidence in the light most favorable to the prosecution here, there was substantial evidence that Vaughn intended to be influenced when he accepted his co-conspirators' payments. Vaughn contends that he would have voted in favor of the two bills regardless, and that the bills would have passed without his support. He emphasizes that the county delegation's Law Enforcement subcommittee, of which he was not a member, was the first entity to consider and support each bill, and that he always voted in line with that subcommittee's recommendations. Additionally, he argues that he was in

favor of Sunday sales legislation as early as 2013 or 2014, and certainly would have been in favor after the Work Group Report of 2014. Thus, and as he told the FBI in his interview, the payments were in appreciation for his pre-ordained votes, rather than a "this for that."

The problem for Vaughn is, even if he "was going to vote for *some kind* of [Sunday sales] legislation," as he claims on appeal, *see* App. Br. at 26 (emphasis added), the evidence presented at trial strongly suggested that Son, Paig, and Lee held sway over him. For example, when the co-conspirators agreed to pay Vaughn $20,000 in installments, it was not clear what form of Sunday sales legislation Vaughn would support. The jury could have believed that it was important to Son, Paig, and Lee that the permits be capped, and that Vaughn intended to be influenced as to the precise contents of the bill. When Vaughn needed an advance of $5,000, he agreed to oppose bills that would otherwise expand the permits. A jury could have reasonably believed that, before this conspiracy when Vaughn allegedly supported Sunday Sales legislation, Vaughn would have favored such permit expansions. Then, when his co-conspirators suddenly asked him to get on board with the Additional Permits Bill that added only five permits, he did so—again, changing his position. Vaughn even wrote a letter to the Liquor Board, specifically stating that a close competitor of Lee's store should not receive a Sunday permit. This is something that would make little sense for Vaughn to do, *unless* he intended to be influenced by his payors.

Finally, the jury was confronted with Vaughn's own recorded statements, which contradicted his contention that the bills were destined to pass. Vaughn was recorded complaining that more liquor store owners were not chipping in, stating "they act like we had to do this. And David will tell you, *it was a fight*." S.J.A. R-7 (emphasis added).

14

Again, "[t]his sh*t didn't really . . . almost didn't go through." S.J.A. R-7. A jury could reasonably believe that he did more than just vote "yes" six times; he worked to pass the bills, which otherwise might have failed. Indeed, the evidence at trial showed that he even threatened to change his position if he did not receive more money, referring apparently to the permit scheme as a "privilege and not a right," which "could be taken away at any time." S.J.A. R-7. And during the 2016 legislative session, he was planning to put the Additional Permits Bill on hold to shake loose another piece of legislation that he supported. That is, until Gorman paid him $2,000 in cash. Vaughn then said, "[l]ike I said I was going to f**k with it. But I'm gonna just . . . I'm gonna lay down . . . I kinda got [elected official] on alert . . . So I ask [elected official] to just lay down." S.J.A. R-15. A reasonable jury could infer that Vaughn shifted his position in exchange for cash.

In sum, the jury was presented with substantial evidence that Vaughn's co-conspirators exerted influence over him. That is strong circumstantial evidence from which the jury could infer that Vaughn intended to be influenced. *See Hamilton,* 701 F.3d at 409 ("[I]ntent can be implied—and it is the jury's role to make such factual inferences."). Therefore, the district court did not err by denying Vaughn's motion for acquittal.

III.

Having affirmed Vaughn's conviction, we review his sentence for reasonableness. *See Gall v. United* States, 552 U.S. 38, 46 (2007). Vaughn identifies three different ways in which he believes the district court procedurally erred by improperly calculating his Guidelines range: (1) by finding more than one bribe under U.S.S.G. § 2C1.1(b)(1); (2) by

15

calculating loss at $100,000 under U.S.S.G. § 2C1.1(b)(2); and (3) by failing to *sua sponte* grant Vaughn a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  We review the district court's legal conclusions de novo and its factual findings for clear error, while considering that sentencing judges need only find facts relevant to the Guidelines range calculation by a preponderance of the evidence.  *See United States v. Cox*, 744 F.3d 305, 308 (4th Cir. 2014).  "Clear error occurs when . . . the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *See id*. (quoting *United States v. Harvey,* 532 F.3d 326, 336–37 (4th Cir. 2008)).  We review Vaughn's third argument, which is unpreserved, for plain error.  *See United States v. Strieper*, 666 F.3d 288, 292 (4th Cir. 2012).

A.

First, Vaughn contends that the district court committed clear error by finding that he participated in more than one bribe under U.S.S.G. § 2C1.1(b)(1), resulting in a two-level enhancement.  Generally, "[r]elated payments that, in essence, constitute a single incident of bribery or extortion (*e.g.*, a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts."  U.S.S.G. § 2C1.1 cmt. 2.  The government argued that each payment constituted a distinct bribe, even though installment payments are treated as a "single incident of bribery."  *Id*. Regardless, and as correctly found by the district court, Vaughn participated in at least two bribes.  First, Vaughn entered into the initial agreement to be paid $20,000 in four installments.  Second, he asked for an advance of a $5,000 installment, and in consideration

16

for that advance, agreed to oppose certain unforeseen bills that would expand the permit scheme. That was not contemplated in the original plan and constituted a distinct quid-pro-quo. We need not count the exact number of bribes, because it is reasonable that the district court found more than one.

B.

Second, Vaughn argues that the district court erred in its calculation of the loss amount, resulting in an erroneous eight-level enhancement. Under U.S.S.G. § 2C1.1(b)(2), "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500," the court must "increase by the number of levels from the [Theft, Property Destruction, and Fraud] table . . . corresponding to that amount." As he did before the district court, Vaughn argues that he was only responsible for the $19,000 in bribes that he was paid, and therefore that his offense level should have only increased by four levels under the relevant pay table, U.S.S.G. § 2B1.1(b)(1)(C). But there are multiple ways to calculate loss under this provision, and the Guidelines direct the court to look at "whichever is *greatest*." *See* U.S.S.G. § 2C1.1(b)(2) (emphasis added).

One of the ways the court may calculate loss is by calculating "the value of anything obtained or to be obtained by a public official *or others acting with a public official*." *Id.* (emphasis added). Here, the district court considered that Paig and Lee, who were acting with Vaughn, each received a Sunday sales permit in conjunction with the scheme.

17

Because permit-holders must invest at least $50,000 in their business over the following year, the court reasoned that they expected the value of the permit to be at least $50,000. Therefore, the district court valued a permit at $50,000. Multiplied by two permits for his co-conspirators, the district court estimated the loss to be more than $95,000, resulting in an eight-level increase. *See* U.S.S.G. § 2B1.1(b)(1)(E). This estimate was reasonable and was certainly reasonably foreseeable to Vaughn.

C.

Third, Vaughn contends that the district court should have *sua sponte* granted a two-level reduction for acceptance of responsibility. Defendants that "clearly demonstrate[] acceptance of responsibility" are eligible for a reduction of their offense level. U.S.S.G. § 3E1.1. In Vaughn's case, the Pre-Sentence Report (PSR) recommended that he receive no points for acceptance of responsibility (hereafter, "acceptance points"). Vaughn did not challenge this aspect of the PSR, and he never argued for acceptance points before the district court. We therefore review for plain error. *See Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018) ("A plain Guidelines error that affects a defendant's substantial rights is precisely the type of error that ordinarily warrants relief under Rule 52(b)."). [3]

On appeal, Vaughn argues that the district court wrongly believed that the

---

[3] To the extent that Vaughn asserts that clear error should apply, we note that this standard would not help him: the district court did not err by declining to grant acceptance points.

*government* awards acceptance points, rather than the court. Our review of the sealed sentencing transcript assures us that this was not the case. The district court recognized its ability to award points for acceptance of responsibility but did not do so.

Vaughn also argues that not awarding acceptance points was an error because he went to trial only to contest his legal, not factual, guilt. In 2016, the Supreme Court narrowed the definition of "official act" under related bribery statute 18 U.S.C. § 201. *See United States v. McDonnell*, 136 S. Ct. 2355 (2016). The district court recognized that *McDonnell* factored into Vaughn's decision to go to trial. It also considered that someone who goes to trial may still receive acceptance points. *See* U.S.S.G. § 3E1.1 cmt. 2 ("Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction."). In fact, it does not seem like the district court held Vaughn's decision to go to trial against him at all.

We grant the district court's evaluation of Vaughn's acceptance of responsibility great deference. *See id*. cmt. 5. In this case, the district court did not err by declining to award Vaughn acceptance points, when Vaughn never accepted responsibility for the convicted offense of *bribery*, only gratuity. Additionally, the court properly considered that Vaughn had accepted some responsibility as mitigation under the § 3553(a) sentencing factors.

*       *       *

All told, the district court conducted a reasonable, thoughtful sentencing hearing for Vaughn, in which it properly calculated the Guidelines range. It did not blindly accept the PSR or the government's stance on the recommended enhancements. Moreover, the jury's

19

verdict rests on substantial evidence that Vaughn intended to be influenced by his co-conspirators in exchange for money. Setting aside the definition of gratuities from a different statute, Vaughn's actions constituted bribery under § 666(1)(B). Vaughn's conviction and sentence are therefore

*AFFIRMED*.